CHARLES DEERING, RICHARD F. HOWE, MARION DEERING McCORMICK, BARBARA DEERING DANIELSON, ROGER DEERING AND WILLIAM DEERING HOWE, *Appellants*, v. JOHN W. MARTIN, GOVERNOR OF THE STATE OF FLORIDA; ERNEST AMOS, COMPTROLLER OF THE STATE OF FLORIDA; J. C. LUNING, TREASURER OF THE STATE; J. B. JOHNSON, ATTORNEY GENERAL OF THE STATE; NATHAN MAYO, COMMISSIONER OF AGRICULTURE OF THE STATE, AS TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, AND A. O. HENDERSON IN HIS OWN RIGHT, *Appellees*.

Opinion Filed February 14, 1928.

*Hudson & Cason,* for Appellants;

*Marvin C. McIntosh, Reynolds, Rogers & Towers* and *Loftin, Stokes & Calkins,* for Appellees.

CAMPBELL, Circuit Judge:

The appellants, as complainants in the court below, filed a bill in equity against the appellees, as respondents, and throughout this opinion we will refer to the appellants as complainants, and the appellees as respondents.

The bill of complaint, after setting forth the names and places of residence of the parties, alleges the following:

"Second. That during his lifetime James Deering was seized and possessed of a certain tract of land lying and being in said Dade county, generally known and referred to as Cape Florida, said tract of land comprising all of the extreme southern end of Key Biscayne, and extending from a line running nearly east and west across said Key from the Atlantic Ocean to Biscayne Bay, for a distance of about one mile more or less to the extremity of said Cape; that said James Deering departed this life on the 21st day of September, 1925, leaving a last will and testament which was duly admitted to probate in the County Judge's Court for said Dade County, Florida, on the 19th day of October, 1925; and that by said will said tract of land was devised by the said James Deering to your complainants, who are now the owners thereof. Extending from the western and southern shores of said land are shoals and shallow banks,

some of which are separated from the mainland by a channel or channels, and some of which are not so separated. The average depth of water at mean high tide upon said banks and shoals, which are separated from the mainland by a channel or channels as aforesaid, varies from four to nine feet; the depth of water upon said shoals and banks which are not separated from the mainland by a channel or channels, varies from three to four feet in depth, in each case at high tide. The bottom of said bay throughout all of said shoals and banks is irregular and uneven with numerous depressions and elevations therein; exceedingly few if any of said elevations having less than three feet of water over them at high tide and many of said depressions varying in depth from six to ten feet, while some have a depth of from ten to fifteen feet.

"Third. That by Section 1061 of the Revised General Statutes of Florida, the Legislature undertook to make provision as follows:

" '1061. Title to Tidal Lands Vested in State.—The title to all islands, sand bars, shallow banks or small islands made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida, or similar, or other islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel or channels, not less than five feet deep at high tide, or sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties, is hereby invested in the Trustees of the Internal Improvement Fund of the State of Florida, to be held by the State of Florida, and disposed of as hereinafter provided.'

"That Section 1062, Revised General Statutes of Florida, is as follows:

230

" '1062. Trustees Have Power to Sell: Notice Required: Objections.—The said Trustees shall have power to sell and convey the islands and submerged lands hereby granted upon such prices and terms as they shall see fit, after giving notice by publication in a newspaper published in the county seat of the county in which such islands or submerged lands are located not less than once a week for four consecutive weeks in order that any persons who have objections to such sale may have opportunity to present the same, and if no objections are filed, within said thirty days, the trustees shall have authority to consummate such sale. If objections are filed, the trustees shall hear and consider the same and if it shall appear that the sale of such islands and submerged lands and their ownership by private persons would interfere with the rights granted to riparian owners by the laws of Florida, or would be a serious impediment to navigation or public fisheries, it shall be the duty of the trustees to withdraw the said lands from sale.'

"That Section 1064, Revised General Statutes of Florida, reads as follows:

" '1064. Purchaser to Have Right to Bulkhead.—In case any such islands or submerged lands are sold by the trustees according to the provisions of Sections 1061 and 1062, the purchaser shall have the right to bulkhead and fill in same as provided by Section 2460 of these Revised General Statutes, without, however, being required to connect the same with the shore or with the permanent wharf.'

"Fourth. That on or about the 19th day of June, 1925, the defendant, A. O. Henderson, applied to the other defendants named above as Trustees of the Internal Improvement Fund of the State of Florida, for sale to him of a part or portion of said banks or shoals, and thereafter said trustees, undertaking to comply with the provisions of Section 1062, aforesaid, caused to be published the following

notice in one of the newspapers of Dade County, Florida, which notice was published once a week for four weeks. A copy of said notice is attached to this bill as 'Exhibit A,' and is made a part of this bill.

"Fifth. That on or about August 12, 1925, defendant, A. O. Henderson, made application to the United States War Department for a permit under Section 10 of Chapter 425 of an Act of Congress of March 3rd, 1899, to allow him to construct certain islands upon the land which he proposed to purchase from said trustees.

"Sixth. That on or about the —— day of September, 1925, said Trustees of the Internal Improvement Fund of the State of Florida executed a certain deed purporting to convey to the defendant, A. O. Henderson, certain property in Dade County, Florida, copy of the description contained in said deed is hereto attached as 'Exhibit B' and made a part of this bill.

"Seventh. Your orators are informed that said deed was executed and delivered to said Henderson, but that it has not yet been filed for record by him.

"Eighth. Your orators are further advised that the said A. O. Henderson now proposes to make application to said Trustees of the Internal Improvement Fund for the sale to him of an additional area of said submerged banks or shoals lying between said tracts 1 and 2 as described in the foregoing deed, but embraced partially or wholly within the lines described in said notice.

"Ninth. Your orators are advised and charged that it is the purpose of the said Henderson to build a chain of fifteen (15) or more islands within the area described by the deed aforesaid, and the area which he proposes to acquire, by the process of placing bulkheads around certain portions of said banks or shoals and dredging into said bulkheads, soil and sand from the adjacent bottoms, and complainant files herewith, marked 'Exhibit I,' a blue-

print of a chart or plat, the legend of which is partly as follows:

" 'Location proposed improvements Biscayne Bay, Florida, to accompany application of A. O. Henderson, dated August 12, 1925.' This blueprint shows clearly the extent of the operations proposed by said A. O. Henderson, and is asked to be taken as a part of this bill.

"Tenth. That the construction of said islands, or of any one or more of them, will constitute a public nuisance, in that the operations necessary thereto, and the islands themselves, after completion, will injure, interfere with, endanger, render insecure and obstruct the proper and inalienable rights of all people of the State in and to the use of said waters for purpose of navigation, commerce, fishing, bathing, and other easements allowed by law in said waters.

"Eleventh. That the construction of said islands, or any one or more of them, will constitute a private nuisance to your orators, in that the operations necessary thereto, and the islands themselves after completion will necessarily result in serious and irreparable injury and damage to complainants' said property, differing materially in kind and degree from the injuries referred to in the tenth paragraph above, in that—

" (1) The construction of the proposed islands will seriously interfere with and obstruct the free passage of the waters of the bay which now flow over and across the banks lying between your orators' property and Ragged Keys to the South thereof, with the inevitable result that new and unknown tidal currents will be created which do not now exist, and erosion, which may very possibly entirely destroy your orators' said property, will necessarily follow. In normal weather this condition will be serious and will more than probably result in irreparable injury to your orators, but in time of storm or hurricane the

proposed islands will act as a dam or bulkhead against the great volume of water driven in from the sea, and when said waters recede the probability of great and irreparable injury to your orators' said property will become a certainty, by reason of the following facts:

"During storms and hurricanes which have occurred in the past, the height of the waters of Biscayne Bay has been raised to four feet above mean high tide. The mean tidal variation of Biscayne Bay is about one and one-half (1½) feet, so in time of storm the height of water above mean low tide has been five and one-half (5½) feet. The average elevation of your complainants' property aforesaid is not over two and 85/100 (2.85) feet above mean low water. The proposed islands are to be bulkheaded to a height of seven (7) feet above mean low water. Said islands will obstruct the free passage of water between the ocean and the bay by partially closing or damming the natural passageway which exists between said Cape Florida, and the Northern end of Ragged Keys. The water will be diverted from its natural course so as to flow over, across, and around complainants' said property: That portion of said Key Biscayne owned by complainants as aforesaid is not of coral or rock formation, but is composed of sand underlaid with marl or hardface, at a depth of approximately six (6) feet. When the waters are driven over this land as aforesaid, it is inevitable that this sand will be washed away, and in the place of Key Biscayne and Cape Florida, there will remain only another submerged marl bank. This injury cannot be compensated in damages, and hence no legal remedy exists.

"(2) Further reference to said 'Exhibit I' will show that means of access to your orators' said property from the South, and West, which is now free and unobstructed, will be seriously and materially interfered with, if not actually destroyed, narrow tortuous channels being substi-

tuted for what is now the open waters of the bay, and your orators' present unobstructed view will be interfered with and virtually destroyed.

"Twelfth. Should said conveyance be confirmed, your orators will be deprived of their property without due process of law, and said deed will ultimately operate to take said property from your orators without just compensation.

"Thirteenth. The notice set out under the fifth paragraph above was insufficient, in that the description given therein of the lands proposed to be conveyed is not sufficiently accurate, nor is it phrased in such terms as might enable any party in interest to definitely determine just where said land lies and where its boundaries are located. Furthermore, while said notice gives the time when said trustees will hear objections to the proposed conveyances, it does not state the place where they will be heard. Hence, your orators are in no sense bound by said defective notice.

"Fourteenth. The deed referred to under the sixth paragraph above is insufficient and void, since, aside from other defects herein set out, it purports to convey two separate tracts of land, which, from the description contained in said deed, may or may not be wholly embraced within the description of the single tract given in said notice. In other words, the description in notice and deed respectively are radically different.

"Fifteenth. That said deed is void because Sections 1061 and 1062, Revised General Statutes of Florida, are unconstitutional and of no force and effect, since by these statutes, the Legislature of Florida undertakes to delegate to the Trustees of the Internal Improvement Fund authority to sell or convey lands covered by navigable waters, which lands are held by the State in its sovereign capacity for the benefit of all the people: That by said Section 1061

the Legislature in effect undertakes to define 'Navigable Waters': And for the further reason that said attempted delegation of authority to sell and convey in no wise limits the purposes for which such sales and conveyances are to be made to purposes beneficial, useful or advantageous to the people of the State; and your orator charges that the Legislature is without authority under the Constitution or laws of this State, to sell and convey such lands as these for purposes detrimental to the public interests, and for the sole purpose of enabling the purchaser thereof to exploit said property for personal advantage and pecuniary gain to himself.

"Sixteenth. That portion of Section 1061, Revised General Statutes of Florida, under which the conveyance above referred to is made, purports to vest in said trustees, title only to 'those sand bars and shallow banks upon which the water is not more than three feet deep at high tide, and which are separated from the shore by a channel or channels.' Your orators allege and charge that the area in question is submerged practically throughout its entirety to a greater depth than three (3) feet at high tide, and that even if said deed were otherwise a good and valid deed, which is specifically denied, its preamble, which limits the lands conveyed thereby to those—'upon which the water is not more than three (3) feet deep at high tide and which are separated from the shores by a channel or channels not less than five (5) feet deep at high tide,' renders said deed of no effect, since there are no appreciable areas within the boundaries attempted to be defined upon which the water is not more than three (3) feet deep at high tide.

"Seventeenth. Even if said Sections 1061 and 1062 are valid and constitutional enactments, which is not here admitted, but on the other hand is expressly denied as hereinbefore set out, the provisions thereof are not broad enough

to authorize conveyance of any land other than 'tidal lands,' and your complainants allege and charge that the shoals with which we are here concerned are in no sense 'tidal lands,' and hence their conveyance by the Trustees of the Internal Improvement Fund is expressly prohibited by the provisions of Section 1230, Revised General Statutes.

"Eighteenth. Furthermore, as the water over the shoals in question, is in fact navigable, the conveyance of these lands for the purpose of bulkheading and filling is in direct contravention of the Act of Congress of March 3rd, 1823, U. S. Statutes at Large, page 756, which reads as follows: 'And be it further enacted, that all the navigable rivers and waters in the districts of East and West Florida shall be, and forever remain, public highways.' "

"EXHIBIT A

"Notice

"Tallahassee, Florida, June 19, 1925.
"NOTICE is hereby given that the Trustees of the Internal Improvement Fund of the State of Florida will hold a meeting at 11 o'clock A. M. Tuesday, August 4th, 1925, for all the purpose of considering the sale of the following described submerged land in Dade County, Florida.

"The submerged area, islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide, and which are separated from the shores by a channel or channels not less than five feet deep at high tide, located in and under the tidal waters of Biscayne Bay, and/or the Atlantic Ocean within the following geographical limits: Between parallel of latitude 25 degrees, 41 minutes North and Ragged Keys at 25 degrees, 32 minutes North Latitude, and between Meridian 80 degrees, 8 minutes, 30 seconds west Longitude and Meridian 80 degrees

12 minutes west longitude, except any part of Key Biscayne, Bounded on the North by that channel running immediately to the south and southwest of the south end of Key Biscayne and bounded on the south by a line running approximately in a northeast and southwest direction about one-half mile northwest of the northernmost key of Ragged Key, following channel limits as determined by the United States War Department.

"This Notice is published in compliance with Section 1062 of the Revised General Statutes of Florida, that any person or persons who may have objections to said sale may have an opportunity to present the same as therein prescribed.

"By order of the Trustees of the Internal Improvement Fund, John W. Martin, Governor.

"Attest: J. Stuart Lewis, Secretary.
7 4/11-18-25; 8/1."

## "EXHIBIT B"

"That certain submerged area, comprising those islands, sand bars and shallow banks upon which the water is not more than three (3) feet deep at high tide and which are separted from the shores by a channel or channels not less than five (5) feet deep at high tide, located in and under the tidal waters of Biscayne Bay and/or the Atlantic Ocean, and being situate in Dade County, Florida, more particularly described as Tract No. 1, and Tract No. 2, as follows:

*Tract No. 1.*

"Commencing at that certain concrete monument on the south shore of Biscayne Bay, marked on all four sides with the Roman numeral Nine (9), thence South eight hundred (800) feet to the point of beginning, which said point of

238

beginning is N. 51 degrees 46 minutes W. 1670 feet from Cape Florida light house;

"Thence N. 73 degrees 28 minutes W. 5105 feet; thence S. 19 degrees 52 minutes W. 4840 feet; thence S. 8 degrees 00 minutes E. 3210 feet; thence N. 83 degrees 00 minutes E. 8405 feet; thence N. 21 degrees 30 minutes W. 6200 feet to the point of beginning as marked and indicated on the chart or plat hereto attached as part hereof, contained after excluding therefrom depressions and deep places where the water is more than three (3) feet at high tide, an area of 364 acres, more or less, together with statutory and common law litteral and riparian rights and all such rights to bulkhead and fill in all lands upon which the water is not more than three (3) feet deep at high tide, which the said Trustees have and/or can lawfully convey to the purchaser.

*Tract No. 2.*

"That flat on which is located Soldiers Key but excepting therefrom said Soldiers Key and surrounding shoals and bounded on the North by the channel running in a Northeasterly and Southwesterly direction and connecting the waters of Biscayne Bay with the waters of the Atlantic Ocean, and bounded on the South by the channel running in a Northeasterly and Southwesterly direction near and to the North of the Northmost Key of Ragged Keys, said channel connecting the waters of Biscayne Bay and the Atlantic Ocean and within the limits on the East and on the West of the Meridian 60 degrees 8 minutes 30 seconds of West longitude and Meridian 80 degrees 12 minutes of West longitude respectively the said tract as defined by its outer edge having dimensions of approximately 15,000 feet North and South by 10,000 feet East and West and containing, after excluding therefrom depressions and deep places where the water is more than three (3) feet deep

at high tide, the area of 459 acres, more or less as marked and indicated on the chart or plat thereto attached as part hereof, together with all statutory and common law litteral and riparian rights and all such rights to bulkhead and fill in all lands upon which the water is not more than three (3) feet deep at high tide which the said trustees have and/or can lawfully convey to the purchaser. The said submerged area being also described as follows:

"Commencing at a firmly set iron rod two inches in diameter six inches above the ground on Ragged Key Number One, thence N. 71 degrees 53 minutes W. 19½ links to a corner standing at the South East End of said Ragged Key Number One, thence N. 9 degrees 45 minutes E. 47.69 chains to a point marked by an iron rod driven into rock on a key known as Umbrella Key with brass cap marked

"A. N. C.
T. 56 S. R. 42 E.
. S. 20 1922

thence North 1120 feet to the point of beginning, thence N. 15 degrees 28 minutes E. 10,700 feet, thence N. 20 degrees 20 minutes W. 2535 feet, thence West 4055 feet, thence S. 36 degrees 28 minutes W. 8490 feet, thence S. 27 degrees 12 minutes E. 6635 feet, thence East 3510 feet to the point of beginning; and containing in the aggregate eight hundred and twenty-three acres, more or less."

The relief sought in the bill of complaint is: That the Trustees of the Internal Improvement Fund be temporarily enjoined and restrained from selling and conveying, or attempting to sell and convey, to the respondent A. O. Henderson, or any other person or persons, any part of that certain submerged land lying between tracts described in the bill of complaint; that A. O. Henderson, and all persons claiming by, through and under him, be temporarily enjoined and restrained from purchasing, or attempting to

purchase, said lands; that A. O. Henderson, and all persons claiming by, through or under him, may be temporarily enjoined and restrained from constructing, or attempting to build or construct, any island or islands, bulkhead or bulkheads, fill or fills, or any other obstruction upon the lands described in the bill of complaint, or upon any part thereof; that the said A. O. Henderson, and all persons claiming by, through, and under him, be restrained and enjoined from filing for record the deed described in the bill of complaint, and from conveying, or attempting to convey, the lands described, or any part thereof, that upon final hearing the temporary restraining order be made perpetual. It is further prayed "that Sections 1061 and 1062 of the Revised General Statutes of Florida, may be construed, that said sections may be declared unconstitutional, and of no force and effect, in so far as the purported conveyance, as referred to in the bill of complaint, is concerned, and in so far as any conveyance of additional land lying between said tracts one and two above described is concerned." It is also prayed that the deed executed by the respondents, the Trustees of the Internal Improvement Fund of the State of Florida, referred to under the eighth paragraph of the bill of complaint, may be declared to be null and void and of no effect, and that said deed be cancelled.

The respondents, The Trustees of the Internal Improvement Fund, and the respondent A. O. Henderson, filed separate demurrers, each demurrer, however, practically raising the same objections to the sufficiency of the bill of complaint.

The application for the temporary restraining order prayed for, and the demurrers to the bill of complaint were heard at the same time. Upon consideration of the two propositions, the court below, after hearing the arguments of counsel and considering the testimony offered by the

respective parties, touching the motion for temporary injunction, rendered its decree, denying the application for temporary restraining order, sustaining the demurrers to the bill, and dismissing the bill of complaint, the complainants' solicitors having announced that they did not desire to amend their bill, but would stand upon the original.

From this decree, which is in effect a final decree, the complainants appeal, assigning as errors:

1. The denial of the application for temporary injunction.

2. The action of the court in sustaining the demurrer to the bill of complaint.

3. That part of the order dismissing the bill of complaint.

We will consider first, assignments of error numbered two and three, which question the ruling of the court below in sustaining the demurrers to and dismissing the bill of complaint. The demurrer of The Trustees of the Internal Improvement Fund contains forty-seven grounds, and there are forty-eight grounds set forth in the demurrer of the respondent A. O. Henderson. These demurrers are both general demurrers, being addressed to the equities contained in the bill of complaint as a whole.

The several grounds of demurrer may be summarized as follows:

1. There is no equity in the bill of complaint.

2. The complainants are not proper parties to seek, in a court of equity, the relief prayed for.

3. The bill of complaint shows upon its face that the alleged transactions between the respondents The Trustees of the Internal Improvement Fund and the respondent A. O. Henderson, were authorized by Sections 1061 and 1062 of the Revised General Statutes of Florida, which demur-

rants claim were valid statutes, authorizing the disposition of the property described in the bill of complaint.

4. That the complainants had not in their bill set forth facts showing that the alleged injury to them was different in kind and degree from the injury to the general public.

As appears from the bill of complaint and the exhibits quoted herein, The Trustees of the Internal Improvement Fund have, under Sections 1061 and 1062, Revised General Statutes of Florida, undertaken to sell to the respondent A. O. Henderson, certain areas, claimed to be shoals and shallow banks, such as are contemplated under the provision of said Section 1061, these areas in question being submerged lands, lying between the waters of the Atlantic Ocean and Biscayne Bay, and extending in a southeasterly direction from a point to the westward of Key Biscayne and Cape Florida to Ragged Key, a distance of some eight miles, and also being located some miles to the eastward of the mainland which borders Biscayne Bay on the west.

The submerged lands in question are sovereignty lands, the same being under the navigable waters in the State. As we said in the case of Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353, 22 L. R. A. 337, ''The navigable waters in the State and the lands under such waters, including the shore and spaces between high and low water marks, are the property of the people of the State, in their united and sovereign capacity. Such lands are not held for the purpose of sale or conversion into other values, or for reduction into several or individual ownership, but for the use of all the people of the State, for the purpose of navigation, commerce, fishing and other useful purposes afforded by the waters thereon.'' See also Ferry Pass Inspectors etc. Assn. v. White River Inspectors etc. Assn., 57 Fla. 399, 48 South. Rep. 643, 22 L. R. A. (N. S.) 345; Merrill & Stevens Co. v. Durkee, 62 Fla. 549, 57 South.

Rep. 428; Symes v. Prairie Pebble Phosphate Co., 64 Fla. 480, 60 South. Rep. 223; Thiesen v. Gulf Florida etc. R. Co., 75 Fla. 28, 78 South. Rep. 491; Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221.

We also said in the case of State *ex rel.* Ellis v. Gerbing, *supra,* ''The State may, in the interest of the public welfare, make limited disposition of portions of the land under navigable waters, within its borders, or may permit the use thereof, when the rights of the whole people of the State as to navigation, and other uses of the waters are not necessarily impaired.'' We said further, in the same case, ''The State cannot abdicate general control over the lands, under navigable waters, within the State, since such abdication would be inconsistent with the implied legal duty of the State to preserve and control such lands, and the waters thereon and the use of them, for the public good.'' Also, ''For the purpose of aiding navigation or commerce, or of encouraging new industries and the development of natural or artificial resources, in the interest of all the people, the State may grant reasonable and limited rights and privileges to individuals in the use of the lands under the navigable waters; but such privileges should not unreasonably impair the rights of the whole people, in the use of the waters or the land thereunder for the purposes implied by law, nor relieve the State of the control and regulation of the uses afforded by the lands and the waters thereon.'' State *ex rel.* Ellis v. Gerbing, *supra.* See also Merrill Stephens Co. v. Durkee, 62 Fla. 549, 57 South. Rep. 428.

The sufficiency of the bill of complaint in this case hinges upon the answer to two propositions: 1. Have the complainants alleged sufficient facts to give them a right to file this bill, complaining of the disposition of sovereignty lands by The Trustees of the Internal Improvement Fund, and the proposed building of the islands described in the bill of

complaint? And 2. Did the Trustees of the Internal Improvement Fund, under Sections 1061 and 1062, have authority to dispose of the shoals and shallow banks, described in the bill of complaint?

The unlawful transfer of public property will be enjoined, and such suit may be brought by tax payers. 22 Cyc. 898; McCord v. Pike, 121 Ill. 288, 12 N. E. Rep. 259. Such suit for an injunction may be brought by a private citizen when he suffers special injury. 22 Cyc. 898; Village of Riverside v. George A. MacLean, 210 Ill. 308, 66 L. R. A. 288.

It appears from the allegations of paragraph two of the bill of complaint that the complainants are the owners of a tract of land comprising the extreme southern end of Key Biscayne, and extending from a line running nearly east and west, for a distance of about one mile, more or less, to the extremity of Cape Florida. From Exhibit ''1'' attached to and made a part of the bill of complaint, and the blue print referred to in paragraph nine of the bill of complaint, it seems that the ''shoals'' and ''shallow banks'' involved and described in the bill extend from a point in Biscayne Bay northwest of Cape Florida, the southern extremity of Key Biscayne, to near Ragged Key, a distance of approximately eight miles, and it further appears from said Exhibit ''1'' that the islands which the respondent A. O. Henderson proposes to build, by the process of bulk-heading these shoals and shallow banks, and by dredging the soil and sand into same, practically cover the entire area claimed by the said Henderson, leaving only narrow channels between said proposed islands to connect the water of Biscayne Bay with the waters of the Atlantic Ocean. It further appears from the same exhibit that in its natural state this area is covered by the waters of Biscayne Bay and the Atlantic Ocean, at depths varying from one to

fifteen and twenty feet. The entire area from Cape Florida to Ragged Key is submerged land, except Soldier Key, which is located several miles from the property claimed by the complainants.

In the eleventh paragraph of the bill of complaint the complainants allege that the construction of the islands, or any one or more of them, will constitute a private nuisance to the complainants, setting forth in more or less detail, in subdivision one of said eleventh paragraph, the effect the construction of the islands will have in obstructing the free passage of the waters of the Bay which flow over and across the banks between the property of complainants and Ragged Key, and that the construction would inevitably result in new and unknown tidal currents; and that during storms and hurricanes, because of the construction of the islands across the area described, the accumulated tide-water in Biscayne Bay would be forced across complainant's property on Key Biscayne, inasmuch as the respondents proposed to build the islands to the height of seven feet above mean low water, when Key Biscayne is only 2.85 feet above mean low water.

It is further alleged in subdivision two of said paragraph eleven, that, as shown by Exhibit "1" attached to the bill of complaint, the way of access to complainants' property from the south and west, which, at the time of the filing of the bill of complaint, was free and unobstructed, would, if the respondents carried out their intention in constructing islands, be seriously and materially interfered with, if not actually destroyed, and that the complainants' unobstructed view would be interfered with and virtually destroyed.

It is shown from the allegations of the bill of complaint, as also from said Exhibit "1" attached thereto, that there is no other person or company whose lands will be subject

to the injuries set forth in said paragraph eleven. The complainants and the Biscayne Company, whose land adjoins the lands of complainants and which has filed a bill of complaint similar to that of the complainants, will, according to the allegations of the bill, suffer damages from the construction of these proposed islands, different in both degree and kind from that suffered by the general public. It is apparent from Exhibit "1" attached to the bill, that the area involved in the transaction between The Trustees of the Internal Improvement Fund and A. O. Henderson, is land entirely covered by the waters of Biscayne Bay and the Atlantic Ocean, that it is beyond any harbor limits, and that over this area there was, at the time of the filing of the bill and prior thereto, an unobstructed view to the south and west from complainants' property; that there was also unobstructed approach from the south and west to complainants' property by light draft craft, and at some points by vessels drawing considerable water. This covered area was property held by the State in trust for the public, and was not subject to the riparian rights of any owner of adjoining lands. The complainants, in acquiring the property described in the bill, purchased it, of course, believing that this expanse of water, with its unobstructed view and means of approach to the property, would not and could not be acquired by private parties for the purpose of building islands which would so radically interfere with the enjoyment of their property. As we have said, the allegations of the bill of complaint and Exhibit "1" attached thereto, show conclusively that none others than the owners of the southern extremity of Biscayne Key will be thus damaged. We think there are sufficient allegations in the bill, together with the Exhibit attached and made a part thereof, showing the location of the property acquired and proposed to be acquired by the respondent A. O. Hender-

son, as also the outlines of the islands he proposes to construct, to show that if the plans are carried into effect, the complainants may suffer damages different, not only in degree, but in kind, from others of the general public.

We said, in Brown v. Florida Chautauqua Association, 59 Fla. 447, 52 South. Rep. 802, "If a public nuisance causes special or peculiar injury to an individual different in kind and not merely in degree from the injury to the public at large, and the injury is substantial in its nature, the individual may have his civil remedy. If the remedy at law is insufficient, equity will afford appropriate relief."

The placing of an unlawful obstruction, or the threatened construction of an unlawful obstruction upon sovereignty lands, which causes or will cause special injury to an individual, group of individuals, or firm or corporation, differing in kind from the public at large, is sufficient to authorize such individual, firm or corporation to file a bill in equity to enjoin the sale by the Trustees of the Internal Improvement Fund of such sovereignty land, when it is alleged that said sale is unauthorized under the laws of Florida. We hold, therefore, that the allegations of paragraph eleven of the bill of complaint are sufficient to withstand the ground of demurrer seeking to question the complainants' right to maintain the bill, and we hold that the complainants were entitled to maintain the bill.

Assuming that Section 1061, et seq., Revised General Statutes of Florida, 1920, authorize the sale and conveyance by the Trustees of the Internal Improvement Fund, of submerged lands situated as are the lands involved in this proceeding, it does not authorize the sale of "islands, sand bars and shallow banks," upon which there is *more* than three feet of water at high tide, and separated from the mainland by a channel or channels, where the depth of water is less than five feet high at high tide.

As appears from the allegations of the bill of complaint quoted in this opinion, the Trustees of the Internal Improvement Fund of Florida have, under the provision of Section 1061, *et seq.*, Revised General Statutes, already sold and conveyed certain submerged area, described in exhibit B. as tracts one and two, to A. O. Henderson, and that the respondent A. O. Henderson proposes to buy certain area between said tracts one and two.

The allegations of the bill of complaint further show that A. O. Henderson has applied to the United States War Department for a permit to be allowed to build certain islands on the submerged lands he has bought and proposes to buy from the trustees; he proposing to build these islands by the process of bulkheading and filling in the same with soil and sand from adjacent bottoms, as authorized by Section 1064 of the Revised General Statutes, where valid sales have been made under the provision of Section 1061, of the Revised General Statutes. The bill of complaint alleges that the respondent, A. O. Henderson, proposes to build fifteen or more of these islands, within the area described in the bill of complaint, and Exhibit B., which is made a part of the bill of complaint.

It is further alleged that the area in question is submerged practically throughout its entirety to a depth greater than three (3) feet at high tide, and that there are no appreciable areas within the boundaries attempted to be defined, upon which the water is not more than three (3) feet at high tide.

There is attached to the bill of complaint and made a part thereof as Exhibit 1, a copy of a blue print of a chart or plat, including the legend thereon, which was submitted by the respondent Henderson to the United States War Department with his application for permit to build the islands, mentioned above. The following appears upon this

copy of plat. "Location proposed improvements Biscayne Bay, Florida, to accompany application by A. O. Henderson, dated August 12, 1925." The bill of complaint alleges that this blue print of the chart or plat shows clearly the extent of the operations proposed by said A. O. Henderson.

There is another entry or memorandum found on Exhibit 1, to the bill of complaint, which is as follows:

"Note. Traced from U. S. Coast and Geodetic Survey Chart No. 1249 and No. 1248."

We find from the figures on Exhibit 1, used to indicate the depth of the water at low tide over the different areas proposed to be filled, that there are only a few places throughout the entire tract described in the deeds, where the water is less than two feet at low tide. The other depths varying from two to fifteen feet at low tide. The bill of complaint alleges that the tidal variations of Biscayne Bay is about one and one-half (1½) feet. It therefore appears from the bill of complaint and Exhibit 1, that there are only very small areas, in this large expanse of water where the depth is less than three (3) feet at high tide.

On the plat referred to above, as Exhibit 1, the spaces intended to be filled in are plainly indicated by certain red lines, and the exterior boundary of the area to be dredged, indicated by red dashes. From the number and sizes of the islands, as shown by Exhibit 1, it appears that almost the entire area, from Biscayne Key on the north to Ragged Key on the south is to be filled in, only narrow channels being left between the proposed fillings. It further appears that within the several areas to be bulkheaded and filled, as shown by the plat, there are numbers indicating different depths, some indicating a depth of less than three feet at high tide, and also depths in the same area exceeding three feet at high tide, yet as shown

by the plat, each of the several areas are to be bulkheaded and filled in its entirety regardless of the depth indicated being greater than three feet.

All these allegations, together with the matters shown on Exhibit 1 attached to the bill, are set forth by the complainants as sustaining their contention that the Trustees of the Internal Improvement Fund were not authorized to sell the respondent the areas in question, and that the respondent A. O. Henderson is not authorized to bulkhead and fill in the same. The demurrers admit the truth of the allegations, and the correctness of the Exhibit 1, and the different facts and conditions indicated thereon. This being true the demurrer to the bill of complaint should have been overruled.

The description of the area, deeded by the Trustees of the Internal Improvement Fund to A. O. Henderson is set forth in Exhibit B, which is attached to and made a part of the bill of complaint.

From the preamble to the description it appears to limit the lands conveyed by the deed to those lands "upon which the water is not more than three (3) feet deep at high tide, and which are separated from the shores by a channel or channels not less than five (5) feet deep at high tide." It then describes tract No. 1, as it is termed, by certain metes and bounds, and concludes with the following: "containing after excluding therefrom depression and deep places where the water is more than three feet at high tide, an area of 364 acres, more or less * * * and all such rights to bulkhead and fill in all lands upon which the water is not more than three feet at high tide, which the said trustees have and/or can lawfully convey to the purchaser."

Tract No. 2, is also described by metes and bounds, after which the following is said: "containing after excluding therefrom depressions and deep places where the water is

more than three (3) feet deep at high tide, an area of 459 acres, more or less as marked and indicated on the chart or plat hereto attached as part hereof * * * and all such rights to bulkhead and fill in all lands upon which the water is not more than three (3) feet at high tide, which the trustees have and/or can lawfully convey to the purchaser.'' The demurrer admitted that Exhibit B gives the description contained in the deed to A. O. Henderson.

We think this description, if the description contained in deed as alleged in the bill is the only description, is too vague and uncertain, to constitute a valid conveyance of submerged lands, coming within the requirements of Section 1061, Revised General Statutes. It practically says that somewhere within the boundaries, which it sets forth, there are 823 acres of land, after excluding depressions and deep places where the water is more than three (3) feet at high tide. There is nothing in the description to indicate the areas where the depth of the water is less than three (3) feet at high tide. There is no guide, by which a surveyor can take the description in the deed as shown by the bill, and locate the acreages, that are intended to be conveyed.

We think the description as set up in the bill, which the demurrer admits, is the correct and only description, is such as would render the deed inoperative because of indefiniteness, and therefore properly gave a basis for the complainant's prayer to declare the deed void.

It may be there is a plat attached to the deed and made a part thereof and of the description, and that therefrom the description may be made definite. If this is true the same can be set up in the answer, but this does not appear from the record as it comes before us at this time. As it appears from the face of the bill, however, we think it sets forth grounds for relief as against the deed, which would withstand the demurrer.

The court below also denied the application of the complainant for temporary injunction prayed for in the bill of complaint. A dismissal of the bill of complaint necessarily disposed of the application for a temporary injunction. There was testimony taken upon the application for temporary injunction, and in as much as the case is to be reversed upon the ruling on the demurrer, and the respondents may desire to file answer, we will not at this time discuss the weight of the testimony touching the results of a construction of the islands in question.

The cause is reversed with directions to the court below to overrule the demurrers to the bill of complaint, granting, if desired, leave to the respondents to file their pleas or answers to the bill.

ELLIS, C. J., AND WHITFIELD, TERRELL, STRUM AND BROWN, J. J., concur.

BUFORD, J., disqualified.

BROWN, J., (concurring):

There may be many stretches of submerged lands in the numerous bays, sounds and inlets of the tidal waters in this State upon which the water is not more than three feet deep at high tide and which are separated from the shore by channels not less than five feet deep at high tide, which are in fact navigable for many useful purposes and valuable for fishing and other purposes, that the legislature could not either by a direct act or through the Internal Improvement Board grant to any private individual or corporation for *private purposes*, without violating the trust under which it holds such lands for the benefit of the people of the State for the purposes of navigation, fishing, boating, bathing, etc. Perhaps no such arbitrary depth

standard should be used as the final and ultimate test. The mere fact that the legislature may say, in effect, that water not more than three feet deep at high tide is not navigable, does not necessarily make it so. Navigability is to some extent a question of fact. 1 Farnham on Waters, pp. 100 and 119, and cases cited. While water three feet deep would not be considered navigable in the harbors of our seaport cities, which berth ocean-going vessels, yet it is a matter of common knowledge that in many sections of the State a large amount of useful navigation and fishing is carried on over and in waters less than three feet deep at high tide, though of such a character as to navigation that the Federal government might not see fit to protect such waters from obstruction; and if all of such lands covered by tidal waters in Florida should be sold and filled in and developed for *private purposes,* it would certainly create a radical change in our vast coastal country. Yet many of such changes could be made, no doubt, without injury to the public rights and without trespassing upon the riparian rights of private owners; which latter rights usually end at the channel or point of navigability. Federal control of navigable waters is limited in its scope and leaves much of the authority of the States thereover untouched. The trust doctrine still applies. 27 R. C. L. 1325, *et seq.*; 1 Farnham on Waters, p. 53 *et seq.* I cannot believe that the legislature of this State intended by this statute to make a wholesale change in the character of our coastal waters and the lands under them. The last sentence of Section 1062 shows that such was not the intention. It may be that the exercise of this power by the administrative board within the broad limits fixed by the statute has thus far been so wise and conservative as to have constituted a public benefit rather than a public detriment, but this is no guarantee that such a broad power as indicated by Section 1061, espe-

cially when construed by itself, may not be so exercised as to conflict with the trust doctrine in the future. And if so mistakenly exercised, the courts may grant relief in proper cases. The rights of the public must not be overlooked. As was remarked by Chief Justice Taney, in Martin v. Waddell, 41 U. S.; 16 Peters 367, 414, 10 L. Ed. 1014, speaking of the common rights in and the advantages of the riparian waters which the colonists enjoyed for the same purposes and to the same extent that they had been used and enjoyed for centuries in England: "Indeed it could not well have been otherwise; for the men who first formed the English settlements could not have been expected to encounter the many hardships that unavoidably attended their immigation to the New World, and to people the banks of its bays and rivers, if the land under the waters at their very doors was liable to immediate appropriation by another as private property and the settler upon the fast land thereby excluded from its enjoyment, and unable to take a shell fish from its bottom, or fasten there a stake, or even bathe in its waters, without becoming a trespasser upon the rights of another."

Section 1062 indicates that the power vested by Section 1061 should not be exercised on objection made when it would interfere "with the rights granted to riparian owners by the laws of Florida, or would be a serious impediment to navigation or public fisheries." In such a case, no doubt, the board should decline to sell even in the absence of formal objection.

It is not my purpose to contend that the trust doctrine, with reference to lands under navigable waters in this State, would preclude the State from transferring to private ownership limited portions of such lands when the rights of the people of the State for which the State holds the title in trust are not invaded or impaired. And such

must have been the intent of the statute. This principle is recognized by our decisions, including those cited in Judge Campbell's opinion. It is also recognized by the decisions of the Supreme Court of the United States.

In Farnham on Waters, p. 173, the author says that this doctrine, together with its limitations, was very fully and adequately stated by Justice Field in Illinois Central R. R. Co. v. Illinois, 146 U. S. 387, 36 L. Ed. 1018, 13 Sup. Ct. Rep. 110. The learned Justice therein said: ''The State holds the title to the lands under the navigable waters in trust for the people of the State, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, free from the obstruction or interference of private parties. * * * The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in prcmoting the interests of the public therein, or which can be disposed of without any substantial impairment of the public interest, in the lands and waters remaining. It is only by observing the distinction between the grant of such parcels for the improvement of the public interest, and which, when occupied, do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled.'' In that case a grant of Chicago Harbor by the State to the railroad company, which grant included the entire control of the harbor and its navigation, was held invalid. The author in his comments says: ''The trust theory cannot, on principle, be carried to such an extent as to prevent the State from

granting the title of the soil under its waters to private individuals and permitting such use of it as is possible, consistent with the public rights.'' In a learned opinion, Chief Justice TAFT, in the case of Appleby v. New York, 271 U. S. 364, 70 L. Ed. 992, held that the State of New York and one of its municipalities had the power to convey to private parties certain small areas of the submerged lands in the Hudson River opposite certain lots owned by such private parties, and that such conveyances carried the fee simple title, and that the State thereby parted with its power to regulate the navigation of the waters over such land, which would interfere with its ownership and enjoyment by the grantee. This decision was based upon the law of New York, as construed by its courts, which was in existence at the time the deeds were made to Appleby and Latou in 1852 and 1853. The suit was brought in 1914 to restrain the City of New York and its lessees, from dredging the land under water conveyed by these deeds and from using the water over the lots as slips and mooring places for vessels. The city and its lessees claimed this right under subsequent legislation, but the Supreme Court held this to be an unconstitutional impairment of the contract, and sustained the right of the grantees to injunction against the city. Chief Justice TAFT held that this case was not in conflict with the case of Illinois Central Railroad Co. v. Illinois, *supra*, in which latter case the Illinois Legislature had granted to the railroad company more than a thousand acres in the harbor of Chicago, being more than three times the area of the actual harbor, and not only embraced all of that harbor, but the adjoining submerged land. The Chief Justice commented on this case as follows: ''It was held that it was not conceivable that the Legislature could divest the State of this absolutely in the interest of a private corporation; that it was a gross perversion of the trust

over the property under which it was held, an abdication of sovereign governmental power, and that a grant of such right was invalid. The limitations on the doctrine were stated by Mr. Justice Field, who delivered the opinion, as follows: (quoting in full the excerpt from Justice Field's opinion, a part of which has just been quoted above). That case arose in the Circuit Court of the United States, and the conclusion reached was necessarily a statement of Illinois law, but the general principle and the exceptions have been recognized the country over and have been approved in several cases in the State of New York.''

Our own Court has frequently recognized this limitation upon the trust doctrine with reference to the lands under navigable waters and tidal waters, as shown by the cases cited by Judge Campbell, and also by the recent case of State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336. In that case this Court upheld the validity of Chapter 8537, Acts of 1921, divesting the State of title to lands covered by water lying in front of tracts of land owned by any person, natural or artificial, fronting upon navigable streams or bays of the sea, as far as the edge of the channel, and giving to such riparian owners the right to wharf out or fill up from the shore, not obstructing the channel, and upon land so filled in to erect improvements consisting of buildings, warehouses, etc. There is no question about the correctness of this holding as to riparian lands. The conveyance of these rights to the riparian proprietors is really founded upon the common law of England as it existed before Mr. Diggs invented his peculiar doctrine, during the reign of Queen Elizabeth, to the effect that the crown held the title to all land between high-water mark and low-water mark of navigable waters. The Stuart kings greatly profited by the use of this doctrine. By steady pressure from the crown this principle finally found its way into the com-

mon law of England, but largely as a theory, while as a practical matter the vast majority of riparian proprietors claimed title to, and ownership over their lands as far as low-water mark, not hesitating in many instances to wharf out to the point of navigability. See 1 Farnham on Waters, pp. 182 to 198.

It was also held in the case just cited that, while the State held for the use and benefit of the people, mud flats, shallow inlets and lowlands, covered more or less by water permanently or at intervals, where the tide ebbs and flows, yet the waters thereon not being in their ordinary state useful for public navigation, the State might part with title to the same by an act of the Legislature. The area in question in that case consisted "as a whole of mud flats which almost in their entirety are uncovered by water at very low tide; that said premises have no value for purposes of commerce or navigation, and that the filling in of the lands as contemplated by the contract by dredging will in reality improve the navigability of Hillsborough Bay and will add to the wealth of the city by removing the mud flats, which are uncovered at low tide."

ELLIS, C. J., AND WHITFIELD, TERRELL AND STRUM, J. J., AND CAMPBELL, CIRCUIT JUDGE, concur.