ANTONIA BOVE, Plaintiff, *v.* DONNER-HANNA COKE CORPORATION,
Defendant.

Supreme Court, Erie County, December 5, 1931.

*Willard H. Ticknor,* for the plaintiff.

*Slee, O'Brian, Hellings & Ulsh,* for the defendant.

LYTLE, J.    This action was brought by the plaintiff, the owner of premises situated on the corner of Abbey and Baraga streets in the city of Buffalo, N. Y., to enjoin the defendant from so operating its coke plant on the westerly side of Abbey street as to cause and allow smoke, soot, dirt and gas to pass over and upon plaintiff's land.    The complaint further asks for money damages for injuries claimed to have been occasioned by the alleged nuisance.

The defendant for its answer denies the existence of a nuisance and alleges as a separate defense that the plant has been and is being operated by the defendant as an agency of the United States of America, under its supervision and direction.

The plaintiff alleges that about the year 1919 the defendant caused to be erected a high chimney and coke ovens on the property near that of the plaintiff, and began the manufacturing of gas and coke; that in conducting its business water is directed and poured upon hot coke from its ovens which causes a great cloud of steam and powdered coke and dust to arise in the air, and quantities of coal dust, dirt and gas are carried by the winds from said chimney and from the ovens in the manufacture of said coke, into and upon the plaintiff's premises in large quantities coming under the windows of plaintiff's house when closed and rendering it impossible for the plaintiff to raise the windows in her house or permit the doors to be opened for any length of time for permitting air or the enjoyment of her house.

The plaintiff further alleges that the defendant keeps stored upon the premises occupied by it large quantities of fine coal, particles of which are blown into and on plaintiff's premises by the wind, and adds to and enhances the damage and injury resulting from the steam and dust created as above mentioned.

That such soot, smoke, dust and gases are obnoxious and unwholesome and injurious to plaintiff and her family in that they corrupt the air in or about the premises; that said smoke, soot, dust and gases have greatly injured plaintiff's property, destroying vegetation, making it impossible to raise vegetables or flowers, and impossible to dry clothes out of doors on her lot. Because of said smoke, soot and dust as aforementioned the plaintiff has suffered great pecuniary losses and damage, said smoke and dust falling upon and discoloring and destroying paint placed upon the house, furniture and furnishings in the house, and rendering the premises unfit for tenants and practically destroying the rental value of said premises, and greatly depreciating the value thereof, and the plaintiff has suffered damage to the amount of $6,000.

On April 21, 1910, the plaintiff purchased two adjoining unimproved lots of land located at the northeast corner of Abbey and Baraga streets in the city of Buffalo, N. Y. During the next two years the plaintiff built a two-story frame house, known as 311 Abbey street, on the southerly or corner lot. The adjoining lot, to the north, has remained vacant and unimproved. Since the erection of the house, the plaintiff has used, and still does use, the front part of the lower floor as a small grocery store and with her family has occupied and still does occupy the rear part of the lower floor as living quarters. The upper floor of said premises has been and still is arranged for two apartments or flats.

At the time the plaintiff bought the lots and erected her house there were no manufacturing plants in the immediate vicinity of

plaintiff's property, except that nine railroads maintained, west of Abbey street, extensive railroad yards with numerous tracks, some of which pass within one-half to three-quarters of a mile to the west and northwest of the location of the plaintiff's house. In 1910 there existed and were being operated within a radius of approximately one-quarter to three-quarters of a mile of the location of the plaintiff's house eight industrial or manufacturing plants, and since 1910 up to the time of the commencement of the present action additional large industrial and manufacturing plants have been built in the vicinity of plaintiff's house. One-half mile to the north of plaintiff's house the Buffalo river, which is navigable, flows westerly across the city of Buffalo. A great number of freighters, tugs and other boats, including coal-burning vessels, pass up and down said river.

At the time the plaintiff acquired her land and when her house was erected, the neighborhood in the vicinity of the said house, particularly to the west of Abbey street and from the Buffalo city line on the south to Elk street on the north, was predominantly devoted to railroad and boat traffic and to heavy industrial plants, and since said time has become increasingly so devoted. In the operation of said railroads and boats and industrial plants great quantities of smoke, soot, dust, dirt, gases and odors have been necessarily given off and subject to the direction of the wind and have generally spread over and settled upon said neighborhood, including plaintiff's house.

In 1925 the city of Buffalo adopted district and zoning ordinances, dividing the city into six classes of use districts and designating the uses permitted in each zone. The city prepared a use map, showing said districts. The portion of the city of Buffalo bounded on the north by the Buffalo river, Pennsylvania railroad and Elk street, bounded east by the Delaware, Lackawanna and Western railroad and Abbey street, and the railroad yards hereinbefore mentioned, bounded south by the Buffalo city line and bounded west by the Buffalo harbor, within which district the defendant's plant is situated, at all times has been and still is a third industrial district, in which the maintenance and operation of heavy industries as specified in section 20 of said district and zoning ordinance has been and is permitted.

The plaintiff's house and vacant lot are located in a first industrial district in which the classes of industries specified in section 18 of said district and zoning ordinance have been and are permitted. Said first industrial district immediately adjoins the third or heaviest industrial district in the city.

On May 29, 1918, the defendant was the owner of certain land

west of Abbey street, and entered into a contract with the United States of America for the purpose of creating a government facility for the manufacture of toluol (a base for high explosives) and similar products, as a war emergency measure. By the terms of this contract, it leased to the government the premises upon which this plant stands, and the defendant also agreed to construct a coke plant at an estimated cost of $6,000,000. The defendant constructed the plant under the supervision of government engineers as to every detail, both of ground plan and plant construction. On June 30, 1920, the defendant and the government entered into a further contract with the United States by the provisions of which the defendant was to complete the plant at the expense of the United States up to a maximum total cost to the United States of $7,500,000. It also provided for the purchase of the plant by the defendant on an installment plan but specifying that the title to the property was to remain in the United States until payments were made in full. Upon the completion of the plant it was provided that the defendant should take over and operate it at its own expense and maintain it in readiness to furnish the quantity and quality of tuloul and ammonium sulphate for which the plant was originally designed for fifteen years after December 31, 1920.

The construction of the plant was completed and it was put in operation during the fall of 1921.

A further contract of December 29, 1929, provided for the erection by the defendant, under government supervision, of fifty-one additional coke ovens, and the method of payment of all balances due or to become due to the United States. Under said contract there remains owing and unpaid by the defendant to the United States upwards of $1,700,000.

The plans for the construction of the plant were prepared by one of the largest engineering concerns, experts in coke oven design and construction. Every detail of construction was originally submitted to and duly approved by the United States, and the entire construction was directly supervised, checked and controlled by the United States, through an experienced coke plant engineer.

In order to maintain the plant in readiness to furnish the quantity and quality of tuluol and ammonium sulphate for which the plant was originally designed, or to keep it in good repair and condition, pursuant to the provisions of said United States contracts, and for the period thereof, the defendant must necessarily keep it in constant operation.

The entire construction and structure maintained by the defendant, together with the equipment and apparatus, were, have been and

are modern and up to date, and the construction, maintenance and operation of said plant at all times have been and are in accordance with the approved practice of other coke plants throughout the United States.

In the operation of the plant, the defendant necessarily is compelled to use quenchers where cooked coke is placed and large quantities of water are released and strike the cooked coke to cool the same and prevent further combustion. During this cooling process quantities of steam, dust and particles of coke arise in the air. It is impossible to confine this quenching process, because the force created by dumping cold water upon this coke at such high degree of temperature might be sufficient to blow down the inclosure.

The construction, maintenance and operation of the quenchers have been and are modern and up to date and in accordance with the approved practice in other coke plants throughout the United States.

With reference to the storage of large quantities of coal upon the defendant's premises, it appears that it is essential to the defendant's successful operation of the plant, and the method of storing, maintaining and handling the coal in the quantities testified to by the defendant in said plant at all times has been, and is modern, up to date and in accordance with the approved practice in other coke plants in the United States.

There seems to be no known method or means of operating by which particles of soot, dust or parts of coke, expelled or liberated in the air, in the operation of defendant's plant can be eliminated or reduced in volume.

The defendant, for a period of more than six years prior to the commencement of this action, had continuously maintained and operated its plant in the same manner and location and to the same extent as said plant was being operated at the time of the commencement of this action.

The plaintiff has offered some proof that because of the conditions as to smoke, coal and coke dust and gas the plaintiff's premises have been rendered less valuable not only from the standpoint of market value but also from rental value. The defendant, in addition to controverting the proof as to depreciation in market value of the plaintiff's property and the loss in rental value of the premises, contends that if in fact there be some damage, it was not, and is not occasioned or caused by the conduct or operation of the defendant's plant, but is due solely to general conditions as to smoke, soot and dust prevailing in said portion of the city due to causes and flowing from sources over which the defendant has no control.

From all the evidence before me I have come to the conclusion that the plaintiff has failed to establish that the operation and maintenance of the defendant's plant constitute a nuisance. Theoretically, every person has the right to have the air diffused over his premises in its natural state, free from all artificial impurities. If the rule were literally applied, its application would seriously disturb business, commerce and society itself. Hence, by air in its natural state is meant pure air consistent with the locality and nature of the community.

" The compromises exacted by the necessities of the social state, and the fact that some inconvenience to others must of necessity often attend the ordinary use of property, without permitting which there could in many cases be no valuable use at all, have compelled the recognition, in all systems of jurisprudence, of the principle that each member of society must submit to annoyances consequent upon the ordinary and common use of property, provided such use is reasonable both as respects the owner of the property, and those immediately affected by the use, in view of time, place and other circumstances. It is in many cases difficult to draw the line, and to determine whether a particular use is consistent with the duties and burdens arising from vicinage, or whether it inflicts an injury for which the law affords a remedy." (*Cogswell* v. *N. Y., N. H. & H. R. R. Co.*, 103 N. Y. 10, at p. 13.)

The use of fuel in places of business, manufacturing establishments and the home is necessary. In proportion as the population thickens, the impurities thrown into the air are increased. The pollution of the air actually necessary to the reasonable enjoyment of life and indispensable to the progress of society, is not actionable, but the right must not be exercised in an unreasonable manner so as to inflict injury upon another unnecessarily.

" The law relating to private nuisances is a law of degree and usually turns on the question of fact whether the use is reasonable or not under all the circumstances. No hard and fast rule controls the subject, for a use that is reasonable under one set of facts would be unreasonable under another. Whether the use of property to carry on a lawful business, which creates smoke or noxious gases in excessive quantities, amounts to a nuisance depends on the facts of each particular case. (21 Am. & Eng. Ency. of Law [2d ed.], 692.) Location, priority of occupation and the fact that the injury is only occasional are not conclusive, but are to be considered in connection with all the evidence and the inference drawn from all the facts proved whether the controlling fact exists that the use is unreasonable. If that fact is found, a nuisance is established and the plaintiff is entitled to relief in some form. Unless that fact

is found, or it is an inference of law from other facts found, no nuisance is established, even if the plaintiff shows that he has suffered some damage, annoyance and injury. Those evils are at times incidental to civilized life and the sufferer finds compensation in the arts and agencies of civilized society. (*Campbell* v. *Seaman* [63 N. Y. 568].) What is reasonable is sometimes a question of law and at others a question of fact. When it depends upon an inference from peculiar, numerous or complicated circumstances it is usually a question of fact. Whether the use of property by one person is reasonable, with reference to the comfortable enjoyment of his own property by another, generally depends upon many and varied facts; such as location, nature of the use, character of the neighborhood, extent and frequency of the injury, the effect on the enjoyment of life, health and property and the like. * * *.

" If the use is reasonable there can be no private nuisance, but if the use is unreasonable and results in substantial injury, an actionable nuisance exists. Trifling results are disregarded, for the courts proceed with great caution and will not interfere with the use of property by the owner thereof unless such use is unreasonable, the injury material and actual, not fanciful or sentimental." (*McCarty* v. *Natural Carbonic Gas Co.*, 189 N. Y. 40, 46, 47, 49.)

Home owners and occupants must in general endure, without legal recourse, all those petty annoyances and discomforts ordinarily and necessarily incident of those trades and businesses which are usual and part of municipal life and which are more or less essential to the existence and comfort and progress of the people. The conflict between the rights of home owners on the one hand and of encroaching industry on the other, has existed immemorially in the course of municipal growth or change.

Although similar cases to the one here have been frequently before the courts and occasionally specific rules for their determination were laid down, it seems that only general principles can be declared, and that each case must be determined upon its own facts in the light of those general principles.

The defendant may make use of its property and carry on any business, not *per se* a nuisance, that produces no unnecessary, unreasonable, unusual or extraordinary impregnation of the air with smoke or soot, to the sensible inconvenience and discomfort of plaintiff's tenements or to the actual tangible and substantial injury of plaintiff's realty.

The proof before me amply establishes that the portion of the city where the plaintiff's and defendant's property is located, has for years been devoted to industrial uses, and with the growth of

the city and the adoption of the zoning laws, the district has been recognized as an industrial district.

The situation existing between the plaintiff's property and defendant's property is by no means uncommon in any city. Such conditions are the rule rather than the exception. The annoyance and damage which plaintiff complains of are not entirely chargeable to the conduct, operation and maintenance of defendant's plant. The condition of smoke, soot and dust is a general one, embracing in its range the entire industrial district of the city and the property in its immediate vicinity. The great number of industrial plants, railroads and navigation all tend to contribute to the general condition prevailing in said section of the city.

In the construction, operation and maintenance of its plant, the defendant pursued and pursues the most modern methods and practices generally approved in the operation of similar plants throughout the United States, and from expert opinion there seems to be nothing that the defendant has overlooked in operating its plant and in providing the best equipment and methods available. The specific complaints as to the operation of the quenchers and the storing and handling of large quantities of coal, I find are not productive of annoyance and inconvenience of substantial character. The use of the quenchers and the manner of handling the coal are not unreasonable under the circumstances and surroundings.

The defendant urges as a complete defense to the present action that the industry of which complaint is made is authorized in the locality where it is being conducted by municipal sanction under the authority of an enabling act of the State.

By chapter 483 of the Laws of 1917 (General City Law, § 20, subds. 24 and 25) the cities of the State were authorized to regulate the location of trades and industries and to district the city for that purpose. The city of Buffalo, pursuant to the enabling act, enacted chapter LXX of the ordinances of the city of Buffalo, dividing the city into six classes of use districts and designating the uses permitted in each zone. Section 19 (A) (7) of this chapter authorized the operation of plants designed for "coal distillation, including manufacture or derivation of the by-products" and "coke ovens" in what was designated the second industrial district. These uses, as well as others more likely to cause discomfort and annoyance to those choosing to reside in the locality, were also authorized in the third industrial district by section 20 of chapter LXX. The plaintiff's property is in the first industrial district and immediately adjoins the third or heaviest industrial district of the city.

There is no attack made upon the validity of said ordinances.

These ordinances expressly license and permit the conduct of this precise industry in the exact location where it is being pursued. These ordinances find their justification in some aspect of the police power, asserted for public welfare. (*Lincoln Trust Co.* v. *Williams Bldg. Corp.*, 229 N. Y. 213; *Wolfsohn* v. *Burden*, 241 id. 288.)

In *Village of Euclid, Ohio*, v. *Ambler Realty Co.* (272 U. S. 365; 47 S. Ct. 114) the court said: " The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. In solving doubts, the maxim ' *sic utere tuo ut alienum non lædas*,' which lies at the foundation of so much of the common law of nuisances, ordinarily will furnish a fairly helpful clew. And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining the scope of, the power. Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality. *Sturgis* v. *Bridgeman*, L. R. 11 Ch. 852, 865. A nuisance may be merely a right thing in the wrong place; like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. *Radice* v. *New York*, 264 U. S. 292, 294."

It must be assumed that the zoning ordinance and regulations were designed to promote the public health, safety and general welfare and were made with reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular uses, the conservation of property values and the direction of building development, in accord with a well-considered plan.

The defendant suggests that where the prosecution of a particular business in a specified place is licensed under public statute, it would constitute a complete defense to a nuisance action brought by private persons. In support the defendant cites: (*Strachan* v. *Beacon Oil Co.* (251 Mass. 479); *Whitcomb* v. *Vigeant* (240 id. 359);

*Levin* v. *Goodwin* (191 id. 341); *Sawyer* v. *Davis* (136 id. 239); *Murtha* v. *Lovewell* (166 id. 391).

The precise question, it seems, has not been dealt with by our courts. Except when one is acting under the authority of statute, he is free from liability for any consequential injuries resulting from his acts, providing the authority of the statute is clear and specific or necessarily implied from that conferred.

Business or industry may be a nuisance either by reason of location or by reason of the improper or negligent manner in which it is conducted. In the instant case no nuisance can be established because of the use of the property complained of in the particular locality. The location and use of the defendant's plant in the district where it is situated are expressly sanctioned by the zoning ordinances of the city of Buffalo.

With reference to the manner in which the defendant conducts its plant, I find that the plant being operated by the defendant is complete and up-to-date in its equipment and is being conducted in the most expert and approved manner known to the industry. Every practicable precaution has been taken to eliminate the escape of dust or dirt in process of manufacture. The crushing of coal and the breaking of coke are both performed in inclosed structures; the endless belt conveyors of coal are housed in galleries, and in charging the ovens, sleeves are fitted over the openings to prevent the escape of dust. The specific operations claimed to be an annoyance to the plaintiff are absolutely essential to the use of the plant.

When the use of the property is expressly authorized and sanctioned for the operation of the defendant's plant, and the manner of conduct of the defendant's plant is reasonable, no actionable nuisance is created as against which relief may be had.

Lawful business will not be enjoined, because it causes some slight inconvenience or irritation to residents in the vicinity.

The defendant contends that it is a complete defense to the complaint in this action that the coke plant is in possession of and being operated by the defendant under contract with the United States in the performance of a governmental function. Although I have concluded that no actionable nuisance has been established to warrant injunctive relief or an assessment of damages it might be well to examine the sufficiency of this defense.

The contracts with the United States government provided that after the emergency period therein specified, the defendant could acquire the interest of the United States in and to the said plant and the lease of said real estate; that thereafter, on June 30, 1920, before the plant was completed, the defendant entered into con-

tracts of purchase and became a purchaser in possession and the United States government retained title until the full purchase price be paid. It was also provided that the defendant keep the plant in proper operating condition and in readiness to furnish the quantity of toluol and ammonium sulphate for which it was originally designed until December 31, 1935. The defendant completed the plant and commenced to operate it in the fall of 1921.

As a general proposition it is true that the courts will not hold conduct to constitute a nuisance where authority therefor exists by virtue of legislative enactment. Where the doing of a thing that would otherwise constitute a public nuisance is authorized by the Legislature, the doing of that thing by the person so authorized, in the manner and for the purpose authorized cannot constitute a nuisance in the absence of negligence.

The essential element lacking in the case at bar, in order to make the above rule applicable, is that the manner of operation of the defendant's plant has not been expressly prescribed or authorized. In other words, the method and manner of operating the quenchers and the handling of coal have not been specified or authorized by any legislative enactment or governmental decree. (*Cogswell* v. *N. Y., N. H. & H. R. R. Co.*, 103 N. Y. 10; *Bohan* v. *Port Jervis G. L. Co.*, 122 id. 18; *Booth* v. *Rome, W. & O. T. R. R. Co.*, 140 id. 267; *Vincent* v. *Hercules Powder Co.*, 228 App. Div. 118; *Corcoran* v. *N. Y. C. R. R. Co.*, 100 Misc. 192.)

A statutory sanction cannot be pleaded in justification of acts which, by the general rules of law, constitute a nuisance to private property, unless they are expressly authorized by statute under which the justification is made or by the plainest and most necessary implication from the powers expressly conferred.

Damage recoverable in action to enjoin a nuisance is the difference in rental value of plaintiff's property free from effects of and subsequent to nuisance. Having reached the conclusion that no nuisance occasioned by the defendant has been established, no award for or assessment of damages can be made.

If the plaintiff has suffered in diminished rentals, this cannot be attributed to the operation of defendant's plant. The development of the industrial district in the immediate vicinity of plaintiff's premises, no doubt, has rendered the premises less desirable and attractive, yet the premises are usable and rentable. Tenants who have vacated the premises did not do so because of any act or condition created by the defendant.

In view of my conclusions, the defendant is entitled to a dismissal of the complaint on the merits.

Let findings and conclusions of law be prepared accordingly.