NATIONAL CONTAINER CORPORATION, *et al.*, v. STATE, *ex rel* JAMES R. STOCKTON, *et al.*

189 So. 4
Opinion Filed May 16, 1939
Rehearing Denied June 2, 1939

34

F. P. *Fleming* and *Fleming, Hamilton & Driver,* for Appellants;

*Lucien H. Boggs* and *John E. Mathews,* for Appellees.

BUFORD, J.—This case is before us to review an interlocutory order of the Circuit Court in and for Duval County wherein separate motions to dismiss the Bill of Complaint were denied and overruled and certain paragraphs of the answer of the defendants thereto were stricken.

In this opinion we shall refer to the appellant as such or as the defendant and to the appellees as such or as plaintiffs.

Some ninety persons, private citizens and taxpayers of Duval County, Florida, on August 20, 1937, filed a bill of complaint in the name of the State of Florida in the Circuit Court against National Container Corporation, a Delaware

corporation, Merritt Chapman & Scott Corporation, a Delaware corporation, Atlantic National Bank of Jacksonville, a banking corporation, and Ernest E. Anders, Thomas C. Imeson, Guy L. Simmons, Philip M. Ulsch, Fred M. Valz as members of and constituting the City Commission of the City of Jacksonville. The relief sought against National Container Corporation is to prevent it from using land in the industrial section of Jacksonville as a site upon which to erect and operate a wood pulp mill upon the theory that the operation of such pulp mill will result in the creation of a public nuisance.

The plaintiffs by the bill also sought to restrain the drilling of artesian wells below the 300-foot level upon the defendant's premises upon the theory, and charged in the bill, that the mill will necessarily and unavoidably emit great quantities of smoke, fumes and gases of such powerful, foul, offensive, persistent smell as to cause material discomfort to the plaintiff and to all other people of the City of Jacksonville and the surrounding communities, both in their homes and at and in their places of business.

It is alleged upon information and belief, that the waste waters to be discharged from said mill into the St. Johns River will prove harmful, injurious and toxic to fish and aquatic life and that the supply of fish will be seriously reduced, if not cut off entirely, thereby seriously and permanently damaging the profitable commercial business and pleasure incident to fishing which now exists in said river.

It is further averred, upon information and belief, by amendment, that a serious health menace will be created in that the waste waters will be of such great and additional oxygen demand that the sewerage of the City of Jacksonville now being emptied into the St. Johns River will not be rendered sterile and harmless.

It is further charged, upon information and belief, that

the use of six million gallons of artesian water from the subterranean basin underlying the City of Jacksonville will, in addition to that already being taken and used from the common source, lower the water level, thereby possibly endangering the entire water supply through and in filteration of salt water.

The bill seeks to restrain the Merritt Chapman & Scott Corporation from proceeding under the contract for the construction of said mill and the drilling of any artesian wells of a depth greater than 300 feet on the premises of National Container Corporation.

It is further alleged that the City Commission of the City of Jacksonville acted unlawfully and in abuse of its discretion in granting the National Container Corporation a permit to drill three or more artesian wells upon its lands and it is charged that the permit is invalid and of no effect, (1st) in that no application was made in conformity with Section 2 of Chapter 6356, Laws of Florida, 1911, a copy of which is attached to and made a part of the Bill of Complaint; (2nd) because the permit failed to prescribe any rule for regulation, reasonably or otherwise, for the driving, boring or encasing the wells, and failed to provide any method of controlling or stopping the flow therefrom as provided by the statute, *supra;* and (3rd) because the City Commission acted recklessly and improvidently without regard to the duties cast upon it by the said statute in that it completely disregarded in granting the permit, protests of relators and other private citizens of Jacksonville and the numerous and various special reports upon the future water supply of the said City and the dangers arising from excessive drafts of artesian water.

It is further charged that the City Commission did not only abuse its discretion in granting the permit but that it further abused its discretion in secretly and clandestinely,

without previous or subsequent announcement to the public press, and without further investigation, eliminating from the permit the provisions authorizing the Commission to cap the wells if in its opinion the water supply of the City was endangered and thereupon prayed that the City Commission be mandatorily enjoined to cancel and rescind the permit therefore granted and restrained from thereafter issuing any further permit.

National Container Corporation and Merritt-Chapman & Scott Corporation filed their respective answers incorporating motions to dismiss the Bill of Complaint.

The plaintiffs filed motion to strike certain portions of the answers of the defendants National Container Corporation and Merritt-Chapman & Scott Corporation. On the same date plaintiffs also filed motion to require each of said defendants to amend certain portions of their answers by giving further and better particulars with respect to matters pleaded in said answers.

The Circuit Court entered its order denying the defendant's several motions to dismiss the bill of complaint and granting the plaintiffs motion to strike and for better particulars with respect to many portions of the separate answers of National Container Corporation and Merritt-Chapman & Scott Corporation. From this order all defendants appealed.

The defendants stress their contention that the Circuit Court was in error in denying the motion to dismiss and also contend that the ruling of the court in striking certain paragraphs of the answers of National Container Corporation and of Merritt-Chapman & Scott Corporation was error.

The appellants have submitted in the brief nineteen questions for our consideration. The third, fourth and fifth questions presented by appellants are stated as follows:

"3. May private persons under sections 5029 and 7832, Compiled General Laws of Florida, 1927, maintain a bill of complaint in the name of the State of Florida to restrain the operation of a pulp mill in Jacksonville on the theory that a public nuisance will necessarily exist through (a) the emission of obnoxious odors; (b) the pollution of the river; and (c) the endangering of the artesian water supply underlying the city?"

"4. May private persons maintain a bill of complaint to restrain the construction and operation of a pulp mill as a public nuisance without the necessity of showing wherein each will suffer a special injury separate and apart from the general public?"

"5. May private persons, without having established any rights in an action at law, maintain a bill of complaint to restrain the construction and operation of a pulp mill upon the theory that a public nuisance will necessarily exist where the mill is not *per se.* a nuisance?"

If these questions are determined in accordance with the contention of appellants it will not be necessary for us to consider other questions.

The appellants, National Container Corporation and Merritt-Chapman & Scott Corporation, set up as grounds to dismiss the bill of complaint the contention presented in questions three, four and five, *supra,* upon the theory that the State has no interest in the suit and is not properly joined and the plaintiff can not utilize the name of the State to maintain this suit. The first and second ground of the motion raised the question of the propriety of joining the State as a party and alleged that there is no authority for the naming of the State as a plaintiff in the suit.

The Plaintiffs contend that they are empowered to bring the suit in the name of the State by express statutory

authority which they insist is found in Section 3223 R. G. S., 5029 C. G. L., which reads as follows:

"5029 (3223). Bill maintained in name of State; parties defendant.—Whenever any nuisance as defined in Section 7832 is kept, maintained or exists, the State's Attorney, County Solicitor, County Prosecutor or any citizen of the county through any attorney he may select, may maintain his action by bill in chancery in the proper court in the name of the State of Florida upon the relation of such attorneys or citizens to enjoin said nuisance, the person or persons conducting or maintaining the same and the owner or agent of the building or ground upon which said nuisance exists."

And under Section 5639 R. G. S., 7832 C. G. L., which is as follows:

"7832 (5639). Places declared a nuisance; may be abated and enjoined.—Whoever shall erect, establish, continue, or maintain, own or lease any building, booth, tent or place which tends to annoy the community or injure the health of the community, or become manifestly injurious to the morals or manners of the people as described in Section 7817, or shall be frequented by the class of persons mentioned in Section 7655, or any house or place of prostitution, assignation, lewdness or place or building where games of chance are engaged in violation of law or any place where any law of the State of Florida is violated, shall be deemed guilty of a nuisance and the building, erection, place, tent or booth and the furniture, fixtures and contents are also declared a nuisance, and all such persons, places shall be abated and enjoined as provided in Article 19, Chapter X, Title III, Second Division of these Compiled General Laws. (Ch. 7367, Acts 1917, No. 1.)"

In this connection, there is another section of the statutes

which should be referred to, Section 5624 R. G. S., 7817 C. G. L., which is as follows:

"Indictment and Removal.—All nuisances which tend to annoy the community or injure the health of the citizens in general, or to corrupt the public morals, shall be indictable and punishable by a fine not exceeding two hundred dollars, at the discretion of the court; and any nuisance which tends to the immediate annoyance of the citizens in general, or is manifestly injurious to the public health and safety, or tends greatly to corrupt the manners and morals of the people, may be removed and suppressed by the order of the justice of the peace of the district; founded upon the verdict of twelve householders of the same, who shall be summoned, sworn and impaneled for that purpose, which order shall be directed to and executed by any sheriff or constable of the county; and an indictment shall lie for the same."

Appellee relies on the opinions and judgments' of this Court in the cases of Pompano Horse Club, Inc., *et al.*, v. State, *ex rel.*, Bryan, 93 Fla. 415, 111 Sou. 801, 52 A. L. R. 51; Kathleen Citrus Land Co. v. City of Lakeland, 124 Fla. 659, 169 Sou. 356; Nelson v. State, 84 Fla. 631, 94 Southern 680. In the Pompano Horse Club case, *supra,* we held:

"When authority is properly conferred upon a private citizen to bring a suit in equity, in the name of the State, for the purpose of suppressing by injunction a public nuisance, the suit is in effect one instituted in behalf of the public, and in which the public is the real complainant, to the same extent as though the suit was brought by the Attorney General or public prosecutor."

It is to be noted that the instant suit was to enjoin not an existing but a threatened nuisance.

It is the contention of the appellants that the statutory authority to maintain suits to abate a nuisance does not confer either express or implied authority on a citizen to

maintain a suit in the name of the State to enjoin and thereby prevent a threatened nuisance. If the authority is express, or may be implied by statute, it is sufficient.

In the case of State of Missouri v. State of Illinois, etc., 180 U. S. 208, text 244, 45 L. Ed. 497, text 513, it was said:

"The bill charges that the acts of the defendants, if not restrained, will result in the transportation, by artificial means and through an unnatural channel of large quantities of undefecated sewerage daily, and of accumulated deposits in the harbor of Chicago and in the bed of the Illinois River, which will poison the water supply of the inhabitants of Missouri, and injuriously affect the portion of the bed or soil of the Mississippi River which lies within its territory.

"In such a state of facts admitted by the demurrer to be true, we do not feel it necessary to enter at large into a discussion of this part of the defendant's contention, but think it sufficient to cite one or two authorities.

"Attorney General v. Jamaica Pond Aquaduct Corp., 133 Mass. 361, was a proceeding in equity in the supreme judicial court to enjoin the defendant from lowering the water in one of the public ponds of Massachusetts. It was claimed that the necessary effect of such lowering would be to impair the rights of the people in the use of the pond for fishing, boating and other lawful purposes, and to create and expose upon the shores of the pond a large quantity of slime, mud and offensive vegetation, detrimental to the public health. The defendants demurred, claiming that no case was stated which came within the equity jurisdiction of the court, and questioning the power of the attorney general on behalf of the commonwealth to maintain the proceedings. Speaking for the Court, the Chief Justice said:

" 'The cases are numerous in which it has been held that

.the attorney general may maintain an information, in equity to restrain a corporation exercising the right of eminent domain under a power delegated to it by the legislature, from any abuse or perversion of the powers, which may create a public nuisance or injuriously affect or endanger the public interests,' citing many cases, and proceeding:

" 'The information in this case alleges not only that the defendant is doing acts which are *ultra vires* and an abuse of the power granted to it by the legislature, but also that the necessary effect of such acts will be to create a public nuisance. This brings the case within the established principle that the court has jurisdiction in equity to restrain and prevent nuisances. And when the nuisance is a public one an information by the attorney general is the appropriate remedy. . . . This information therefore can be sustained on the ground that the unlawful acts of the defendant will produce a nuisance by partially draining the pond and exposing its shores, thus endangering the public health.'

"And replying to the claim that resort to equity was unnecessary, the Court further said:

" 'The defendant contends that the law furnishes a plain, adequate and complete remedy for this nuisance by an indictment or by proceedings under the statutes for the abatement of the nuisance by the board of health. Neither of these remedies can be invoked until a part of the mischief is done, and they could not in the nature of things, restore the pond, the land and the under-ground currents to the same condition in which they are now. In other words, they could not remedy the whole mischief. The preventive force of a decree in equity, restraining the illegal acts before any mischief is done, gives clearly a more efficacious and complete remedy.'

"The nature of equitable remedy in the case of public nuisances was well described by Mr. Justice HARLAN,

speaking for the Court in the case of *Mugler* v. *Kansas,* 123 U. S. 623, 673, 31 L. Ed. 205, 214, 8 Sup. Ct. Rep. 273, 303:

" 'The ground of this jurisdiction, in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual and permanent remedy than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensures, but arrest or abate those in progress and by perpetual injunction protect the public against them in the future whereas courts of law can only reach existing nuisances, leaving future acts to be the subjects of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals or safety of the community.'

"In *Coosaw Min. Co.* v. *South Carolina,* 144 U. S. 550, 36 L. Ed. 537, 12 Sup. Ct. Rep. 689, it was said by this Court, through Mr. Justice HARLAN, after citing English and American cases:

" 'Proceedings at law or by indictment can only reach past or present wrongs done by the appellant, and will not adequately protect the public interests in the future. What the public are entitled to have is security for all time against illegal interference with the control by the State of the digging, mining and removing of phosphate rock and phosphatic deposits in the bed of the Coosaw River.'

"It is finally contended that if the bill was not prematurely filed, then it was too late; that, by standing by for so long a period, the complainant was guilty of such laches that a court of equity will not grant relief.

"The inconsistency between these contentions is manifest, and, on consideration, we are of the opinion that the suggestion that the complainant's remedy has been lost by delay is not founded in fact or reason."

Further in the opinion the Court quotes with approval

excerpts from the opinion in the case of Chapman v. Rochester, 110 N. Y. 273, 1 L. R. A. 296, 18 N. E. 88, saying:

"Similar views prevailing in *Chapman* v. *Rochester,* 110 N. Y. 273, 1 L. R. A. 296, 18 N. E. 88, were a bill was filed to enjoin the defendant city from polluting, by the discharge of sewerage by artificial means, a natural stream flowing through his lands.

"In the opinion of the New York Court of Appeals, it was said by Danforth, J., after citing *Goldsmid* v. *Tunbridge Wells Improv. Comrs.:*

" 'In view of the principle upon which these and like decisions turn, the objections of the learned counsel for the defendant against the judgment appealed from are quite unimportant. The filth of the city does not flow naturally to the lands of the plaintiff, as surface water finds its level, but is carried thither by artificial arrangements prepared by the city, and for which it is responsible. Nor is the plaintiff estopped by acquiescense in the proceedings of the city in devising and carrying out its system of sewerage. The principle invoked by the appellant has no application. It does not appear that the plaintiff in any way encouraged the adoption of that system, or by any act or word induced the city authorities to so direct the sewers that the flow from them should reach his premises. There is no finding to that effect and the record contains no evidence. In fine, the case comes within the general rule which gives to a person injured by the pollution of air or water, to the use of which, in its natural condition, he is entitled, an action against the party, whether it be a natural person or corporation, who causes that pollution.'

"Cases cited by defendants' counsel where injunctions were refused to aid in the suppression of public nuisances, were cases where the act complained of was fully com-

pleted and where the nuisance was not one resulting from conduct repeated from day to day. Most of them were cases of purpresture, and concerned permanent structures already existing when courts in equity were appealed to.

"The bill in this case does not assail the drainage canal as an unlawful structure, nor aim to prevent its use as a waterway. What is sought is relief against the pouring of sewerage and filth through it, by artificial arrangements, into the Mississippi River, to the detriment of the State of Missouri and her inhabitants, and the acts are not merely those that have been done or which, when done, cease to operate, but acts contemplated as continually repeated from day to day. The relief prayed for is against, not merely the creation of a nuisance, but against its maintenance.

"Our conclusion, therefore, is that the demurrers filed by the respective defendants cannot be sustained. We do not wish to be understood as holding that, in a case like the present one, where the injuries complained of grow out of the prosecution of a public work authorized by law, a court of equity ought to interpose by way of preliminary or interlocutory injunction, when it is denied by answer that there is any reasonable foundation for the charges contained in the bill. We are dealing with a case of a bill alleging, in explicit terms, that damage and irreparable injury will naturally and necessarily be occasioned by acts of the defendants, and where the defendants have chosen to have their rights disposed of, so far as the present hearing is concerned, upon the assertations of this bill.

"We fully agree with the contention of defendant's counsel that it is settled that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence; that if the evidence be conflicting and the injury be doubtful, that conflict and doubt will be ground for withholding

an injunction; and that, where interposition by injunction is sought, to restrain that which it is apprehended will create a nuisance of which its complainant may complain the proofs must show such a state of facts as will manifest the danger to be real and immediate. But such observations are not relevant to the case as it is now before us."

It will be observed that the statute 5639 R. G. S., 7832 C. G. L., provides:

"Whoever shall erect, establish, continue or maintain, own or lease any building, booth, tent or place which tends to annoy the community or injure the health of the community . . . shall be deemed guilty of a nuisance and the building, erection, place, tent or booth, and the furniture, fixtures, and contents are also declared a nuisance, and all such persons, places shall be abated and enjoined as provided in Article 19, Chapter X, Title III, Second Division of these Compiled General Laws."

And Section 3223 R. G. S., 5029 C. G. L., provides:

"Whenever any nuisance as defined in Section 7832 is kept, maintained or exists the State's attorney, county solicitor, county prosecutor or any citizen of the county through any attorney he may select may maintain his action by bill of chancery in the proper court in the name of the State of Florida upon the relation of such attorney or citizens to enjoin said nuisance * * *."

Now the statute merely extends to the citizen the right to act in the name of the State in that class of cases where under the statute without such provision the citizen could not act affirmatively but would have to depend entirely upon the willingness of the Attorney General to use in the name of the State.

There could be no question but that the citizen would have the right to maintain the suit if a nuisance actually existed. If a liberal construction is given Section 5639

R. G. S., 7832 C. G. L., it may be said that the statute. con-templates a threatened, as well as an existing, nuisance; but whether this construction be given the statute or not, as it might be strictly construed the statute by implication pro-hibits the erection or establishment of any building or place which when used for the purposes for which its building and construction is intended will tend to annoy the community or injure the health of the community, and, therefore the statute by implication prohibits the building or erection or that which when used for the purpose for which it is built and erected will become a nuisance. This being within the implied prohibition of the statute, then Section 3223 R. G. S., 5029 C. G. L., expressly authorizes the maintenance of the suit to prevent the consummation of the nuisance.

We do not conceive that this holding is in conflict with anything said in the case of Pompano Horse Club v. State, *supra.* The holding in that case was in effect that a private citizen under provision of the statutes, *supra,* may maintain a suit in the name of the State of Florida to restrain the continuance of an existing nuisance. Neither is this in conflict with Lutterloh v. Mayor and Council of Town of Cedar Keys, 15 Fla. 306; Jacksonville T. & K. W. Ry. Co. v. Thompson, 34 Fla. 346, 15 Sou. 282; Robbins, *et al.,* v. White, 52 Fla. 613, 42 Sou. 841; City of Gainesville, *et al.,* v. Phifer, 64 Fla. 34, 59 Sou. 194; Bozeman, *et al.,* v. City of St. Petersburg, *et al.,* 74 Fla. 336, 76 Sou. 894; Deering, *et al.,* v. Martin, *et al.,* 95 Fla. 224, 116 Sou. 54; Biscayne Co., *et al.,* v. Martin, 95 Fla. 259, 116 Sou. 66. In all those cases this Court held that for a citizen to maintain a suit in his individual capacity to enjoin a nuisance it is necessary for him to show some special interest or damage accruing to him by reason of the continuance of such nuisance.

Brown v. Florida Chautauqua Assn., 59 Fla. 447, 52 Sou. 802, in which we held:

"If an unlawful obstruction in a public highway merely interferes with the right of passage that is common to all, and no individual rights are specially or peculiarly injured, relief should be had through the proper public authorities."

At a glance, this would appear to be in conflict with our present holding, but it will be observed that that opinion was rendered in 1910 and the Act authorizing a citizen to maintain suits of this kind in the name of the State was Chapter 7367, Acts of 1917.

In using the language "threatened nuisance" herein we do not mean a mere threat to do a thing which may result in the creation of something which may be a nuisance, but we contemplate by this language the beginning of construction or the proceeding with plans which, if consummated, will necessarily result in the creation of a public nuisance.

Having decided that a suit of this character may be maintained by a private citizen in the name of the State, we shall next consider whether or not the bill states a cause of action for injunction relief against the operation of the pulp mill as *a public nuisance* on the theory that it will necessarily result in the emission of noxious odors, fumes and gases and that the injury is inevitable, pressing and eminent and that the operation of such mill will necessarily be of such character in this regard that it may be enjoined.

By the adoption on November 4, 1930, of **constitutional** amendment to Section 12 of Article IX of the Constitution, there was written into the organic law of this State, the following:

"Section 12. For a period of fifteen years from the beginning of operation, all industrial plants which shall be established in this State on or after July 1, 1929, engaged

primarily during said period in the manufacture of steel vessels, automobile tires, fabrics, and textiles, wood pulp, paper, paper bags, fiber board, automobiles, automobile parts, air-craft, aircraft parts, glass and crockery manufacturers and the refining of sugar and oils and including by-products or, derivatives incident to the manufacture of any of the above products, shall be exempt from all taxation, except that no exemption which shall become effective by virtue of this amendment shall extend beyond the year 1948.

"The exemption herein authorized shall not apply to real estate owned and used by such industrial plants except the real estate occupied as the location required to house such industrial plants and the buildings and property situated thereon, together with such lands as may be required for warehouses, storage, trackage and shipping facilities and being used for such purposes."

By the adoption of this Amendment industrial plants of the kind and character mentioned therein were not only authorized but were invited and importuned to take up their abode and operate in the State of Florida. Among such manufacturing plants are those engaged primarily in the manufacture of wood pulp, paper, paper bags and fiber board. A statute may be effective to take a thing out of the class of public nuisance but here we have something more than a mere statute. We have provision of the organic law which is a definite recognition that a pulp mill is not a public nuisance when properly conducted and operated. It is a matter of common knowledge and, therefore, as courts may be assumed to know what everyone else knows, a fact of which courts may take judicial cognizance, that all wood-pulp mills emit noxious and disagreeable odors. It may be that the volume, extent and offensiveness of such odors may be to some extent controlled and, if such can be done, it is the duty of the operators of such manu-

facturing plants to use the most approved and efficient methods to eliminate, as far as possible, this disagreeable feature but, when the people of the State of Florida by an overwhelming vote, wrote into the Constitution not only the permit for pulp paper manufacturing plants to operate in this State but guaranteed to them as an inducement to come and operate in this State the exemption from all taxes from certain property used in such enterprise for a period of fifteen years, it did not mean for them to come in and bring their working capital and the facilities of employing hundreds of people in those plants but to leave outside the State its noises and offensive odors which would necessarily be produced when it began and continued operation.

In other words, the State of Florida offered the inducement *cum onore*. The defendant National Container Corporation accepted the invitation and accepted the terms under the Constitution and although the odors may be disagreeable, noxious and offensive, if the plant is operated in such manner as to, as far as is possible with presently known methods, to reduce or eliminate the emission of such noxious and offensive odors, it cannot be held to constitute a public nuisance. See Inglis v. Rymer, 113 Fla. 732, 152 Sou. 4; Sullivan v. Moreno, 19 Fla. 200; Randall v. Jacksonville Street R. R. Co., 19 Fla. 409. See also State v. Erie R. R. Co., 48 N. J. L. 661, 87 Atl. 141; Whitcomb v. Vigeant, 204 Mass. 359, 134 N. E. 241.

The supreme power of government rests in the people. The people shape the government by the adoption of constitutions (which in our State are adopted or rejected by direct vote), where is found the supreme or organic law and by the enactment of statutes through their duly elected representatives which, if not in conflict with organic law, are binding upon all departments of government and on all people and all property coming within their purview.

The people exercising their power to promulgate the supreme law of this State said to wood-pulp manufacturers, in effect, "come unto us and you shall be free of all taxation upon the millions of dollars in property which you may acquire and use in the operation of your manufacturing plants in this State until 1948."

With our limited knowledge of the wood-pulp industry and our knowledge of Florida, we may safely say that there is no place in Florida suitable or useable as a location for a wood-pulp mill where the smoke, gases and noxious odors emitted from the mill would not be disagreeable, annoying and obnoxious to some citizens of Florida. If ninety or even thousands of citizens may enjoin in the name of the State the operation of such a plant, then the same right extends to each and every citizen and the operation of such plants, which has been sanctioned by the supreme law of the State, could be prohibited by judicial decree.

In the Pompano Horse Club case, *supra,* decided in 1927, we held:

"There is a manifest distinction between enjoining an individual from committing a crime and enjoining the owner of property, or its possessor, from using his property in a manner or for a purpose which is duly declared to constitute a public nuisance because such use is subversive of the public peace or morals."

"When a group of persons, each of whom has contributed money to a common fund and received a ticket or certificate representing such contribution, adopt a horse race, the result of which is uncertain, as a means of determining *by chance,* which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of the certificates so obtained and held by the contributors to such fund being varied or

affected by the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the original purchase price of all having been the same, those who chose the winning horse being paid, from the fund so accumulated, more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who, therefore, receive nothing, that process constitutes a 'game of chance'; and those who buy, sell or redeem such certificates, for the purpose and in the manner stated are 'engaged' in such game within the contemplation of Section 5639, Revised General Statutes, 1920. The acts just outlined also constitute 'gambling' as defined and prohibited by Section 5514, Revised General Statutes, 1920."

The very same conditions which were held to constitute a public nuisance have the same evil attributes today which obtained then, but those conditions have been sanctioned by legislative enactment, Chapter 14832, Acts of 1931, and they no longer constitute a public nuisance in those localities where the terms of the statute have been met.

That such result would logically follow is evidenced by the opinion and judgment in the case of Canada Paper Co. v. Brown, 63 Con. S. C. 243, 66 Dominion Law Reports 287, where the suit to restrain was by one individual to protect his enjoyment of the use and occupancy of a country home and wherein the relief sought was granted. In that case, however, it does not appear that there had been, as in Florida, a Constitutional sanction of the operation in the Dominion of such manufacturing plants. In this sanction by a special and definite provision of our Constitution is found the basis for holding that in this phase the particular annoyance, a necessary incident to the manufacture of wood pulp has been immunized from having the status of a public nuisance.

Whether or not the constitutional provision, *supra,* may also immunize the appellant from the liability to answer in damages to persons who are specially damaged in their property rights is a question not before us and which we do not assume to answer. The immunity effectuated by the Constitution, *supra,* will not protect the appellant, National Container Corporation, should it fail to use the best known available and practical facilities to minimize the causes of annoyance complained of. The duty rests upon it to so conduct its business that as far as is practical and available the annoyances necessarily incident to the operation of its plant should be reduced and minimized as much as is reasonably possible and the law requires them to use the most efficient known practical and available methods and facilities to this end. McCarthy v. National Carbonic Gas Co., 189 N. Y. 40, 81 N. E. 549; Dove v. Donner-Hanna Coke Corporation, 142 Misc. Rep. 329, 254 N. Y. St. 403, 236 N. Y. App. Div. 37, 258 N. Y. St. 229; further appeal denied 258 N. Y. St. 1075; Reber v. Ill. Central R. Co., 161 Miss. 885, 138 Southern 574; Ebur. v. Alloy Metal Wire Co., 304 Pa. 177, 155 Atl. 280.

We next consider paragraph 6 of the bill of complaint, which is as followss:

"As a necessary part of the operation of such a pulp and kraft paper mill as the defendant National Container Corporation now threatens to build, there will be discharged enormous quantities of waste and refuse matter consisting in part of undigested or partly digested wood cells, and in part of divers chemicals with which the same have been treated, and the products of the action of such chemicals upon pine wood. Said defendant threatens to discharge, and unless restrained therefrom as hereinafter prayed, will discharge such waste and refuse matter from its said plant into the waters of the St. Johns River, to which the prop-

erty hereinabove described is riparian. The waters of said river from that point to the mouth of said river, and for not less than fifty miles above said plant, are subject to the ebb and flow of the tide, by which such waste and refuse matter will be carried to great distances in the waters of said river both above and below the location of said proposed plant. Relator-plaintiffs, upon information and belief, allege: That such waste and refuse matter will be toxic to fish, and other forms of marine and aquatic life which live in the waters of the St. Johns River adjacent to said plant, both above and below, or travel through said waters for purposes of spawning and will be highly toxic to various forms of aquatic plant life upon which such fish are accustomed to feed; that by means of the discharge of such waste and refuse matter the supply of such fish will be seriously reduced, if not cut off entirely, and the profitable commercial business which now exists in the catching and marketing of such fish will be seriously and permanently damaged, as will also the pleasure and recreation afforded the people of Florida who are accustomed in great numbers to fish in the lower waters of the St. Johns River and its estuaries and ocean waters adjacent thereto for recreation, pleasure and personal food; that by this means, also, there will be inflicted great damage to the people of the City of Jacksonville in the loss of trade and custom from those who now engage in such fishing commercially or for recreational purposes."

Bearing in mind that this is a suit in the name of the State and that in such cases no special damage is required to be shown by or to the individual who maintains such suit, we hold that there is equity which the State may assert in the allegations of the bill just above quoted.

It will be observed that the allegations are that: "As a necessary part of the operation of such pulp and kraft paper

mill as the defendant National Container Corporation now threatens to build there will be discharged enormous quantities of waste and refuse matters,' etc. It also alleges: "Said defendant threatens to discharge and, unless restrained therefrom as hereinafter prayed, will discharge such waste and refuse matter from its said plant into the waters of the St. Johns' River." It is further charged, "The waters of the said river from that point to the mouth of said river and for not less than fifty miles above said plant are subject to the ebb and flow of the tide, by which such waste and refuse matter will be carried to great distances into waters of said river both above and below the location of said proposed plant."

It is unnecessary to again quote the remainder of that paragraph of the bill.

The allegations are sufficient to require an answer.

If, as a matter of fact, it is a necessary part of the operation of such pulp and kraft paper mill as its particular location to discharge enormous quantities of waste and refuse matter into the river which will be highly toxic to fish and other forms of marine and equatic life and which will be highly toxic to aquatic plant life upon which the fish in the river will be seriously reduced, if not entirely cut off, and the profitable commercial business which now exists in the catching and marketing of such fish will be seriously and permanently damaged and the facilities for pleasure and recreation will be thereby diminished and damaged, we think that it requires no citation of authority to support the assertion that the State may enjoin the consummation of the damage which is threatened even before the damaging condition comes into being. The allegations are such as to admit of denial.

While the Constitutional provision, *supra,* immunizes the appellant from the status of a public nuisance in the opera-

tion of its plant with all its necessary and unavoidable objectionable features and conditions, it in no wise immunizes it from being held to constitute a public nuisance by reason of its offending the public welfare, health and convenience by creating an obnoxious condition, which, by the application of known and practical methods, it may obviate.

The bill of complaint shows that the appellees, as individuals, are riparian owners along the allegedly affected areas of the St. Johns River and, although it is not necessary for them, as individuals, to show any special damage in a suit instituted in the name of the State, the allegations are sufficient to show, if it were necessary, that they will suffer peculiar damage if the allegations of the bill are shown to be true. See Weston Paper Co. v. Pope, *et al.,* 155 Ind. 394, 57 N. E. 719.

It is contended by the appellant that because the allegations, *supra,* are stated on information and belief they are insufficient. This position would be correct if the bill sought interlocutory relief, but we take it this rule does not apply here.

Section 28 of Florida Chancery Practice Act provides, *inter alia:*

"Third: A statement of and prayer for any special relief pending the suit or on final hearing, which may be stated and sought in alternative forms. If special relief pending the suit be desired the bill should be verified by the oath of the plaintiff, or someone having knowledge of the facts upon which such relief is asked. Prayers for general relief and for subpoena shall be omitted. Every bill of complaint shall be considered to pray for general relief."

Mr. McCarthy, in his annotation, says:

"This section expressly provides that where special relief pending the suit is desired the bill shall be verified. The general rule of equity practice was that a bill need not be

verified unless the plaintiff sought an interlocutory order or decree granting some relief, pending the litigation, but there were certain exceptions, namely: bills seeking discovery and praying for relief thereon, which relief would otherwise be obtainable at law; bills seeking writ of *ne exeat*; bills to perpetuate testimony; bills to review on the ground of discovery of new matter; and bills of interpleader. Fletcher, Eq. Pl. & Pr. Sec. 83, p. 116. See Brown v. Marsh, 98 Fla. 253, 123 So. 762, regarding the required affidavit of no collusion to bill of interpleader. This act is not intended to affect express statutory provisions requiring the bill to be verified. See Sec. 3111, 3113 R. G. S. (4895, 4897 C. G. L.), relating to constructive service; Sec. 3184, R. G. S. (4976 C. G. L.), relating to writ of *ne exeat;* Sec. 3205, R. G. S. (4997 C. G. L.), relating to bills for partition; Ch. 11383, Acts 1925, Sec. 3 (5012 C. G. L.), relating to suits to quiet title."

See also 10 Ency. Pleadings & Prac. 963, Sec. 22; paragraph (b) Sec. 22.

Cases cited by appellant do not support the rule contended for where interlocutory restraining order is not sought.

The contention that the bill does not state a cause of action for restraining the use of artesian water in the operation of the pulp mill is directed to the allegations of the bill contained in paragraphs 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19, which are as follows:

"7. As a necessary part of the operation of such a mill as defendant National Container Corporation now threatens to build, there will be used an enormous quantity of water, averaging not less than a minimum of 6,000,000 gallons per day. Its supply of water for such purposes said defendant proposes to obtain, and, unless enjoined from so doing, will obtain from artesian wells which it will cause to be drilled

upon the premises aforesaid, at a distance approximately
2½ miles from Water Works Park where the principal
municipal artesian wells supplying the City of Jacksonville
are located.

"8.   Relator-plaintiffs, upon information and belief allege
that the configuration of the underground strata of per-
meable and non-permeable rocks under the City of Jackson-
ville and vicinity is such that the water drawn from any
artesian wells drilled upon the premises aforesaid must
come from the subterranean basin which constitutes the
principal source of supply of the municipal water works
system of the City of Jacksonville.

"9.   The consumption of water in the City of Jackson-
ville obtained through municipal sources is approximately
12,000,000 gallons per day, averaged through an annual
period, most of which is derived from municipal wells
driven in the Water Works Park in said city.   In addition
there are in said city a large number of privately owned
artesian wells (the exact number being unknown to relator-
plaintiffs), many of which derive their water supply from
the same basin which supplied the municipal wells in Water
Works Park.   No figures are available from which may be
computed the average flow from the private wells so located,
but relator-plaintiffs, upon information and belief, allege
that the flow therefrom averaged through an annual period
is not less than 20,000,000 gallons per day.   Relator-
plaintiffs, upon information and belief, allege that the ad-
ditional demand occasioned by the water requirements of
said mill will draw upon and deplete the supply available
for the City of Jacksonville to such an extent as will render
it insufficient for the needs of the inhabitants of said city
for domestic use, the use of industrial plants already estab-
lished, and the needs of said city for fire protection; nor can
sufficient additional water be obtained from other existing

municipal sources, in the Water Works Park area or elsewhere, to remedy such shortage.

"10. Relator-plaintiffs allege, upon information and belief, that the subterranean basin underlying the municipal wells of said city is connected with the Atlantic Ocean by divers subterranean channels; that there is grave danger that through such channels salt ocean water will infiltrate into the municipal wells, pipes, tanks and settling basins, when and if the pressure or 'head' of said wells is diminished to such an extent as it will be when and if the water requirements of said proposed mills are met from wells proposed to be driven by defendant National Container Corporation. If such infiltration takes place, it will block and corrode pipes, tanks and other metal appliances pertinent to the municipal water system, injure the like appliances in homes and industrial plants taking their supply from the City of Jacksonville, and by excess of salinity, ruin the municipal water supply for both domestic and industrial uses. In such event, the water supply for the municipal plant will be irrepairably injured so as to necessitate the construction of an entirely new municipal water supply system which could be constructed only at a cost to said City and its taxpayers of many millions of dollars, and only after a delay of many months, during which time the inhabitants of said city would suffer intensely from water shortage in the respects hereinabove set forth.

"11. And so it is that if said proposed wells be driven, great and irreparable injury will be done to the comfort, health and safety of the inhabitants of the City of Jacksonville, their protection from fire materially lessened, their property damaged and reduced in value, and great additional burdens of taxation will be cast upon them.

"12. By Chapter 6356, Laws of Florida 1911, a copy of which is hereto attached, made part hereof, marked Ex-

hibit 1, the Legislature of Florida determined and found that the residents of the City of Jacksonville, Florida, are wholly dependent on subterranean water to supply them for domestic, agricultural and mechanical purposes; that the supply of such water within said territory is limited and is being gradually diminished; that there is grave danger that such water supply will be exhausted to such extent as to be insufficient to supply the needs of a growing and increasing population, and that it is necessary that the water supply of said City be conserved as much as practicable. To that end, by said statute it was, among other things, in substance provided:

"(a)  That no person thereafter desiring to drive an artesion well within the corporate limits of said City should begin such work until he should have obtained a permit therefor from the Board of Trustees for the Waterworks and Improvement Bonds of said City, otherwise known as the Board of Bond Trustees; that any such applicant must first file with said Board a description of the parcel of land on which he desires to drive such well, the size of the proposed well, the purpose for which it shall be used, and his interest or title to such land.

"(b)  That said Board be vested with the power of prescribing reasonable rules and regulations for the driving of artesian wells within said limits to a greater depth than 300 feet, or increasing the same, preventing, controlling, or reducing the flow of water therefrom when the same is not being used in reasonable quantities for domestic, agricultural or mechanical purposes, and for otherwise conserving the supply of subterranean waters; that all such rules and regulations should be adopted at a regular meeting of the Board and be recorded in a book to be kept for that purpose in its office.

"(c)  That the rights of the City of Jacksonville, and all

other persons under said statute might be enforced by injunction or other appropriate action.

"13.  Pursuant to the statute hereinabove referred to, rules and regulations governing the sinking and boring of artesian wells within the city limits of Jacksonville were adopted and a form of application for permit therefor was prescribed at a meeting of the Board of Bond Trustees of said City held August 4, 1911, as will more fully appear from an excerpt from the minutes of said meeting hereto attached, made part hereof, marked Exhibit 2.

"14.  Thereafter, by Section 8, Chapter 7659, Laws of Florida, 1917, said Board of Bond Trustees was abolished and all of its powers and duties were transferred to, vested in and imposed upon the City Commission of The City of Jacksonville, hereinafter referred to as 'Commission.' No action has ever been taken by the Commission to modify, amend or supersede in any respect the form of application for permit, or the rules and regulation promulgated in that behalf by said Board of Bond Trustees.

"15.  On April 24, 1937, a letter was received by the Commission from the Jacksonville Chamber of Commerce in which, among other things, said Chamber of Commerce recommended that the Commission grant the right and privilege to defendant National Container Corporation to drill three or more artesian wells, either upon such real estate as it may acquire in connection with construction of the proposed mill or upon such other lands as it might acquire, or upon which it might acquire from the owners the right to drill such wells; provided that such other locations should be in the vicinity of the mill and in no event at a distance greater than one mile therefrom; and provided that only the natural flow of water from such wells should be used.  Said letter coming up for consideration before a meeting of the Commission held on said date, the defendants

Anders, Imeson, Simmons and Ulsch, purporting to act as the City Commission of said City, but actually without any authority of law so to do, adopted a resolution approving the recommendations made in said letter, and authorizing the Chairman and Acting Secretary of the Commission to execute a proposal to defendant National Container Corporation embodying said recommendations, as will more fully appear from excerpt from the minutes of said meeting hereto attached, made part thereof, marked Exhibit 3.

"16. On April 24, 1937, acting under the pretended authority of said resolution of the Commission, defendant Ulsch as Chairman of the Commission, and one J. E. Ingram as its Acting Secretary sent a letter to defendant National Container Corporation, which, among other things, purported to grant to defendant National Container Corporation the right and privilege to drill three or more artesian wells in accordance with said recommendation of the Jacksonville Chamber of Commerce (Ex. 3 hereto) and subject only to such restrictions as were therein contained. Copy of said letter is hereto attached, made part hereof, marked Exhibit 4.

"17. On July 19, 1937, defendant National Container Corporation by letter requested the Commission for permission to drill one or more artesian wells upon the lands hereinabove described, copy of which letter is hereto attached, made part hereof, marked Exhibit 5. On July 21, 1937, defendants Ulsch, Valz, Anders, Simmons and Imeson, purporting to act as the City Commission of the City of Jacksonville, but actually without any authority of law so to do, by resolution, granted permission to defendant National Container Corporation to drill a well upon its said property, provided, however, that only the natural flow of said well might be used and reserving the right, in the event in the opinion of the Commission the water supply of the

City of Jacksonville should be endangered, to order such well capped without delay and the flow therefrom stopped. A copy of said resolution is hereto attached, made part hereof, marked Exhibit 6.

"18. On August 5, 1937, said defendants, Ulsch, Anders, Simmons and Imeson purporting to act as the City Commission of the City of Jacksonville, but actually without any authority of law so to do, by resolution, amended said pretended permit so as to authorize the drilling of three or more artesian wells upon the property of defendant National Container Corporation instead of a single well. A copy of said resolution is hereto attached, made part hereof, marked Exhibit 7.

"19. On August 9, 1937, said defendants, Ulsch, Valz, Anders and Simmons, purporting to act under authority of law as the City Commission of the City of Jacksonville, but actually without any authority of law so to do, by resolution, further amended said pretended permit so as to eliminate the reservation contained in said resolution of July 21, 1937 (Ex. 6 hereto), whereby the Commission in the event in its opinion the water supply of the City of Jacksonville should be endangered, might order said wells capped and the flow therefrom stopped, and granted said pretended permit in accordance with paragraph 4 of said letter of April 24, 1937, to defendant National Container Corporation (Ex. 4 hereto). Defendant Imeson voted against the passage of said resolution. Copy of said resolution is hereto attached, made part hereof, marked Exhibit 8. Said resolution was not adopted at any meeting of the City Commission, either regular or special, and no quorum of three Commissioners was present as required by Section 3, Chapter 7659, Laws of Florida, 1917; by reason whereof, and in addition to the other grounds of invalidity herein-

after set forth, said pretended resolution last mentioned is utterly void and of no effect."

These allegations are not sufficient to show the right to maintain this suit on this ground. The City and its residents are bound by the applicable statutes in this regard.

It is immaterial whether the limitations prescribed by statute or the reserved power and authority vested in the City Commission by the statute were written into the permit granted National Container Corporation. Under the law, the statutory provisions in that regard (See Chapter 6356, Acts of 1911, and Chapter 7659, Acts of 1917) become a part of the contract and permit just as effectually as if those provisions had been written into the contract and permit. The statutes contemplate that the City Commission may grant permit for the drilling of artesian wells and also vests the supervisory control of those wells in the City Commission and until the statute has been disregarded and it has been shown that the City Commission has refused to exercise its discretion in the control of the amount of waters taken from such wells so as to protect the public in the water supply, it cannot be assumed, nor can the allegations be heard that the Commission will in the future disregard its statutory duty in this respect.

As to the allegations of the answer which were stricken, which were applicable to the original bill of complaint, we think that it is not necessary for us to now discuss.

It is represented at the bar of the court and in pleadings filed here that the condition has changed since the bill of complaint was filed, so that it may be necessary to recast the bill or to file a supplemental bill, because of such changed conditions and to interpose answer to such amended or supplemented bill.

It appearing that there is equity in the bill found in the allegations in regard to the threatened pollution of the

waters of the St. Johns River, the order of the Chancellor denying the motion to dismiss the bill of complaint should be affirmed and it is so ordered.

Affirmed.

TERRELL, C. J., and WHITFIELD, BROWN and THOMAS, J. J., concur.

CHAPMAN, J., agrees to the conclusion reached in this case.