678 So.2d 356 (1996)
BAL HARBOUR VILLAGE, a municipal corporation organized and existing under the laws of the State of Florida, Appellant,
v.
CITY OF NORTH MIAMI, a municipal corporation organized and existing under the laws of the State of Florida, Appellee.
No. 94-2841.
District Court of Appeal of Florida, Third District.
April 17, 1996.
Rehearing Denied September 11, 1996.
*358 Floyd Pearson Richman Greer Weil Brumbaugh & Russomanno and Gerald F. Richman and Robert J. Borrello, Miami, for appellant.
David M. Wolpin, City Attorney, North Miami, for appellee.
Before SCHWARTZ, C.J.[*], and COPE and GODERICH,* JJ.
COPE, Judge.
Bal Harbour Village appeals a final order dismissing its lawsuit against the City of North Miami. We affirm.
Bal Harbour filed the instant lawsuit against the City of North Miami, seeking to prevent North Miami from building an open-air amphitheater near the shores of Biscayne Bay. Bal Harbour Village is located, at its nearest point, 7,600 feet across Biscayne Bay from North Miami. Concerned primarily about the possibility of excessive noise from the open-air amphitheater, Bal Harbour Village opposed the project. Bal Harbour and North Miami entered into a settlement agreement which established a procedure for assuring that noise emitting from the amphitheater would be controlled at acceptable levels. Thereafter Bal Harbour brought suit, contending that North Miami had breached the settlement agreement. From dismissal of its second amended complaint, Bal Harbour appeals.[1]

I.
On December 8, 1992, the North Miami City Council adopted Ordinance 888, which rezoned a 106-acre tract of land from Public Use (P.U.) to Public Use/Planned Unit Development (P.U./P.U.D) to permit the development of a city-owned performing arts amphitheater facility. The amphitheater will be located east of Biscayne Boulevard between Northeast 135 Street and Northeast 151 Street, near the North Campus of Florida International University. The amphitheater will have a capacity of 26,000 people and parking for up to 4,500 cars. Ordinance 888 also granted a conditional use permit. The facility is to be constructed and operated by Performing Arts Management of North Miami, Inc. ("Operator").
Ordinance 888, the supporting studies, and the agreement with the Operator all address the question of noise standards. Sound leaving the amphitheater is not to exceed the level of 50 decibels. Amplified sound must be directed toward the commercial and industrial areas situated to the northwest of the amphitheater, which is in the opposite direction from Bal Harbour. Ordinance 888 allows the City to establish operational and noise level limitations and performance standards for the amphitheater. Noise monitoring may be conducted by North Miami at the Operator's expense. North Miami reserves the right, in the event the noise standards are not met, to restrict the operating hours of the facility, or to void the conditional use *359 permit. Additionally, the Operator is required to design the amphitheater
so as to be able to structurally enclose the covered seating area in the event that operation of the Facility fails to comply with the sound and noise standards provided pursuant to this ordinance. Operator shall implement the enclosure plan designed as a remedy if and when it has been determined by City (based upon study and advice provided to the City Council by the City's independent Noise Consultant) that all other sound mitigation remedies implemented by Operator have failed to bring the sound into compliance with the terms hereof.
Ordinance 888, § 3.III.G.(3).
Bal Harbour appeared at the North Miami City Council meeting and presented testimony in opposition to the enactment of Ordinance 888. The Ordinance was nonetheless adopted.

II.
On January 7, 1993, Bal Harbour filed a statutory "verified complaint" with North Miami, contending that Ordinance 888 was inconsistent with North Miami's Comprehensive Plan. See generally §§ 163.3161-.3215, Fla.Stat. (1993). Section 163.3215, Florida Statutes, authorizes certain litigants to challenge the consistency of a development order[2] with a city's duly adopted comprehensive plan. Id. § 163.3215(1), (3)(b). Prior to instituting any lawsuit, "the complaining party shall first file a verified complaint with the local government whose actions are complained of setting forth the facts upon which the complaint is based and the relief sought by the complaining party." Id. § 163.3215(4). This "verified complaint" must be filed with the local government "no later than 30 days after the alleged inconsistent action has been taken." Id.
Bal Harbour's timely "verified complaint" asserted that Ordinance 888 had been enacted contrary to the Intergovernmental Coordination Element of North Miami's Comprehensive Plan. Bal Harbour contended that noise from events at the facility would carry across Biscayne Bay and into Bal Harbour, thus adversely affecting the quality of life there. Bal Harbour also expressed concern about adverse environmental impact on Biscayne Bay, which Bal Harbour shares in common with North Miami. Finally, Bal Harbour asserted that the parking requirements for the amphitheater exceeded the threshold for a development of regional impact ("DRI"), see § 380.0651(3)(b)1.a., Fla. Stat., and that the amphitheater project had not undergone the review required for a DRI.[3]
On February 23, 1993, North Miami and Bal Harbour entered into a settlement of their dispute. The settlement was embodied in Resolution No. R93-14 ("the Settlement Resolution"), adopted by the North Miami City Council. The Resolution recited that North Miami had retained independent consultant Dr. Clifford Bragdon to undertake "the necessary noise study and review to assure that the [amphitheater] facility will be designed, built and operated in such a manner as to assure that there will be no adverse noise impact on any residential communities in the vicinity...." The resolution recited that "Bal Harbour Village has retained a noise consultant, Dr. Stanley Dunn, and has authorized Dr. Dunn to participate in the work of Dr. Bragdon as set forth in the Work Plan described by Dr. Bragdon at the meeting of February 8, 1993...." The Settlement Resolution provided in substance that any areas of technical disagreement should be resolved if possible by discussion between Dr. Dunn and Dr. Bragdon. If any technical issues could not be resolved by discussion of the two of them, the issue was then to be resolved if possible "by the binding determination of an independent scientist to be mutually selected by Dr. Dunn and Dr. Bragdon."
*360 Bal Harbour agreed that it would not institute or support any litigation against North Miami "pending completion of the above referenced Noise Study Work or the issuance by the City of North Miami of a building permit for the construction of the Amphitheater Facility...." In return, North Miami recognized that Bal Harbour could file a "verified complaint" under section 163.3215 when North Miami issued a building permit for the amphitheater, and if the "verified complaint" was not resolved, then Bal Harbour could proceed with a lawsuit in accordance with section 163.3215. North Miami further agreed that it would waive any defense that Bal Harbour was estopped, or bound by res judicata, by reason of allowing Ordinance 888 to become final.
In the meantime, other litigants filed lawsuits seeking to stop the amphitheater project. Pichette v. City of North Miami, 642 So.2d 1165 (Fla. 3d DCA 1994); Abramson v. City of North Miami, 634 So.2d 632 (Fla. 3d DCA 1994). In Pichette, one citizen of Bay Harbour Islands and two citizens of North Miami Beach filed suit contending that they would be adversely affected by noise and other effects from the amphitheater project. In November 1993, North Miami moved for summary judgment and filed an affidavit executed by Dr. Bragdon in support of the proposition that there would be no adverse noise effects on the plaintiffs in the Pichette litigation.
Against the advice of its legal counsel, Bal Harbour took the position that the execution of the affidavit by Dr. Bragdon in the Pichette litigation indicated that Dr. Bragdon had prejudged the results of the noise study, which was not yet complete. Bal Harbour asserted that by obtaining and filing the affidavit of Dr. Bragdon in the Pichette litigation, North Miami had breached the Settlement Resolution. Bal Harbour took the position that the claimed breach by North Miami relieved Bal Harbour of any further obligations under the Settlement Resolution, including the obligation to refrain from participating in any litigation against North Miami. Since the trial court had entered summary judgment in favor of North Miami in the Pichette litigation, Bal Harbour voted to provide funding for the appeal in Pichette.
Next, on January 11, 1994, Bal Harbour filed the instant lawsuit against North Miami. Bal Harbour claimed that North Miami had breached the settlement agreement; that Ordinance 888 contravened the North Miami Comprehensive Plan, the North Miami Zoning Code, and should be set aside under Section 2-11.1 of the Metropolitan Dade County Code; that the proposed amphitheater would constitute a nuisance; and that Bal Harbour was fraudulently induced to enter into the settlement agreement. The trial court granted motions to dismiss all claims. Bal Harbour has appealed.

III.
We affirm dismissal of Bal Harbour's claim under section 163.3215, Florida Statutes. In that claim (Count II of the amended complaint) Bal Harbour asserted that Ordinance 888 was inconsistent with the North Miami Comprehensive Plan.
Section 163.3215 specifies that in order to challenge the consistency of a development order with a comprehensive plan, the litigant must first file a "verified complaint" with the appropriate local government. Id. § 163.3215(4). This "verified complaint" must be filed "no later than 30 days after the alleged inconsistent action has been taken." Id. The local government is allowed 30 days to respond. Id. "Thereafter, the complaining party may institute the action authorized in this section. However, the action shall be instituted no later than 30 days after the expiration of the 30-day period which the local government has to take appropriate action." Id. (emphasis added).
We agree with the Fifth District Court of Appeal that the time limit specified in Section 163.3215 is jurisdictional. See Board of Trustees of the Internal Improvement Trust Fund v. Seminole County Board of County Commissioners, 623 So.2d 593, 595-96 (Fla. 5th DCA 1993), review denied, 634 So.2d 622 (Fla.1994). The legislative intent is very clear that a challenge to a development order under Section 163.3215 must be brought within the narrow time limits *361 specified by the statute, or else must not be brought at all. In the present case, Bal Harbour filed its "verified complaint" with North Miami on January 7, 1993. Assuming that North Miami responded on the thirtieth day (February 6, 1993) and Bal Harbour filed a lawsuit on the thirtieth day thereafter, the deadline for filing would have been sixty days after January 7, 1993, or March 8, 1993. The instant lawsuit was not filed until January 11, 1994. The claim under Section 163.3215 is time-barred.[4]
Bal Harbour contends, however, that the untimeliness can be excused if it is found that North Miami breached the settlement agreement, or fraudulently induced Bal Harbour to enter into the settlement agreement. We disagree. The time limits here are jurisdictional. If Bal Harbour were to establish that there was a breach of the settlement agreement by North Miami, it would be confined to contract remedies. See Weinberg v. Lozman, 364 So.2d 841, 842 (Fla. 3d DCA 1978). If Bal Harbour established fraudulent inducement, it would be entitled to such remedies as may be authorized by law. However, such remedies do not include authority for initiating a challenge to Ordinance 888 after the jurisdictional time limit has expired. See generally Metro-Dade Police Department v. Hidalgo, 601 So.2d 1259 (Fla. 3d DCA 1992); International Studio Apartment Association, Inc. v. Sun Holiday Resorts, Inc., 375 So.2d 335, 336 (Fla. 4th DCA 1979), cert. denied, 383 So.2d 1196 (Fla.1980); Fiat Motors of North America, Inc. v. Calvin, 356 So.2d 908, 909 (Fla. 1st DCA), cert. denied, 360 So.2d 1247 (Fla.1978).

IV.
We affirm the dismissal of Bal Harbour's claim that Ordinance 888 violated section 29-12.1(i)(3) of the North Miami Zoning Code. Assuming that this claim is not time-barred[5], we conclude that the amended complaint does not state a cause of action on this issue. The provision relied on by Bal Harbour is contained within North Miami's Public Use-Planned Unit Development Ordinance. Bal Harbour seeks to invoke section 29-12.1(i)(3), which provides certain protections for owners of abutting property. The court may take judicial notice of the map of Dade County, and it is clear that under any definition, Bal Harbour does not qualify as "abutting property" for purposes of this ordinance. See Davis Water & Waste Industries, Inc. v. Embry Development Corp., 603 So.2d 1357, 1359 (Fla. 1st DCA 1992); see also North Miami Code § 29-12.1(j)(2)[6]; Banana River Properties v. City of Cocoa Beach, 287 So.2d 377, 381-82 (Fla. 4th DCA *362 1973). Accordingly this count was correctly dismissed.[7]

V.
The trial court dismissed Bal Harbour's claim that Ordinance 888 was voidable because it was adopted in violation of Section 2-11.1 of the Metropolitan Dade County Code. Section 2-11.1 is the Dade County Conflict of Interest and Code of Ethics Ordinance ("Code of Ethics Ordinance"). We agree with the trial court.
Bal Harbour's amended complaint (Count IV) alleged that North Miami Mayor Michael Colodny is an attorney and is counsel for the Operator, Performing Arts Management of North Miami, Inc. The amended complaint alleged that the Mayor served as chair of a special city council meeting in 1992 at which the Management Agreement with the Operator was discussed and approved by the City Council. The amended complaint also alleged that the Mayor chaired, and participated in, the meeting at which Ordinance 888 was adopted. Ordinance 888 reveals on its face that the Mayor abstained from voting on the ordinance. Bal Harbour alleges, however, that under the Code of Ethics Ordinance the Mayor was obligated to leave the meeting and refrain from any discussion. Bal Harbour further contends that under the Code of Ethics Ordinance, the Mayor's actions rendered Ordinance 888 voidable.
By its express terms, the Code of Ethics Ordinance refers to Dade County, county commissioners, and other personnel not relevant here. The Code of Ethics Ordinance also states, however, that the Code of Ethics Ordinance shall "constitute a minimum standard of ethical conduct and behavior for all municipal officials and officers ... insofar as their individual relationships with their own municipal governments are concerned. References in the section to County personnel shall therefor [sic] be applicable to municipal personnel who serve in comparable capacities to the County personnel referred to." Id. § 2-11.1(a). The parties agree that the Code of Ethics Ordinance applies to North Miami and its Mayor.
The provision relied on by Bal Harbour states:
(d) Further prohibition on transacting business with the County. No person included in the terms defined in subsections (b)(1) [county commissioners] through (6) and in subsection (b)(9) shall enter into any contract or transact any business through a firm, corporation, partnership or business entity in which he or any member of his immediate family has a controlling financial interest, direct or indirect, with Dade County or any person or agency acting for Dade County, and any such contract, agreement or business engagement entered in violation of this subsection shall render the transaction voidable....
Additionally, no person included in the term defined in subsection (b)(1) [county commissioners] shall vote on or participate in any way in any matter presented to the Board of County Commissioners if said person has any of the following relationships with any of the persons or entities which would be or might be directly or indirectly affected by any action of the Board of County Commissioners: (i) officer, director, partner, of counsel, consultant, employee, fiduciary or beneficiary; or (ii) stockholder, bondholder, debtor, or creditor, if in any instance the transaction or matter would affect the person defined in subsection (b)(1) in a manner distinct from the manner in which it would affect the public generally. Any person included in the term defined in subsection (b)(1) who has any of the above relationships or who would or might, directly or indirectly, profit or be enhanced by the action of the Board of County Commissioners shall absent himself or herself from the Commission meeting during the discussion of the subject item and shall not vote on or participate in any way in said matter. *363 (Emphasis added).[8]
Bal Harbour argues that its amended complaint alleges a violation of the second paragraph of subsection 2-11.1(d). Bal Harbour contends that if there is a violation of any part of subsection 2-11.1(d), it follows that the transaction is voidable. In this case Bal Harbour says that by failing to leave the Commission meeting, and by participating in the meeting, the Mayor violated subsection 2-11.1(d) and accordingly, Ordinance 888 is voidable.
We disagree with Bal Harbour's interpretation of the ordinance. Subsection 2-11.1(d) has two paragraphs, which address two distinct problems. The first paragraph prohibits, among other things, the elected official from entering into a contract or transacting business with the governmental entity on which the elected officer serves. In this case, the first paragraph means that the Mayor could not enter into a contract or transact business with North Miami directly or "through a firm, corporation, partnership or business entity in which he or any member of his immediate family has a controlling financial interest, direct or indirect...." Id. The first paragraph goes on to say that "any such contract, agreement or business engagement entered in violation of this subsection shall render the transaction voidable." Id. (emphasis added). The phraseology "such contract, agreement, or business engagement"refers back to the class of contracts, agreements, or business engagements described earlier in the same sentence: contracts or business engagements entered into directly by the elected officer, or through a business entity in which the elected officer or member of his immediate family has a controlling financial interest. For this particular class of business transactions, the Code of Ethics Ordinance is intended to allow the contract or transaction to be set aside.
By contrast, the second paragraph of subsection 2-11.1(d) regulates the voting and deliberations of elected commissioners (including in this case, the Mayor) if the elected official has any of the relationships specified in the second paragraph. An elected official covered by the second paragraph "shall absent himself or herself from the Commission meeting during the discussion of the subject item and shall not vote on or participate in any way in said matter." Id. Unlike the first paragraph, the second paragraph does not provide for the voidability of any action taken in violation of the second paragraph.[9] In our view, the voidability provision of subsection 2-11.1(d) has no application to this case, and may not be invoked in an attempt to set aside Ordinance 888.[10]

VI.
In its second amended complaint, Bal Harbour sought to enjoin construction of the amphitheater as a nuisance. Bal Harbour alleged that the project would constitute a nuisance on account of the noise emanating from the amphitheater. Bal Harbour also asserted that the proposed project site is a former dump site containing hazardous waste, which has been designated as a "Superfund Site" by the United States Environmental Protection Agency. Bal Harbour alleged that construction of the project would cause substantial water and air pollution, including leakage of hazardous waste. The *364 trial court dismissed the nuisance count, with which action we agree.
First, with respect to the pollution claims, dismissal is appropriate under the doctrines of primary jurisdiction and exhaustion of administrative remedies. Ordinance 888 expressly provides, "No development shall occur pursuant to this ordinance prior to approval by the state D.E.R. [formerly the Florida Department of Environmental Regulation, now the Florida Department of Environmental Protection] of City's Munisport Landfill Closure Design, and all development must be consistent with the approved Landfill Closure Design." Ordinance 888, § 3.I.; see also § 403.707, Fla.Stat. (1993). Where, as here, environmental permits must be obtained from the Department of Environmental Protection as a condition to allowing the project to proceed, it is appropriate to defer to the Department on the matters which are within the agency's expertise. "Judicial intervention in the decision-making function of the executive branch must be restrained in order to support the integrity of the administrative process and to allow the executive branch to carry out its responsibilities as a co-equal branch of government." Key Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153, 157 (Fla.1982); Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park, Inc., 361 So.2d 695, 698-99 (Fla.1978); Odham v. Foremost Dairies, Inc., 128 So.2d 586, 593 (Fla.1961); State ex rel. Department of General Services v. Willis, 344 So.2d 580, 589 (Fla. 1st DCA 1977). The dismissal is, of course, without prejudice to Bal Harbour to pursue its environmental objections with the Florida Department of Environmental Protection and the federal Environmental Protection Agency, respectively.[11] Dismissal is also appropriate to the extent that the matters complained of by Bal Harbour are cognizable through the Development of Regional Impact process. See § 380.06, Fla.Stat.[12] The law of nuisance is not intended to serve as a substitute for exhaustion of available administrative remedies.
Second, we conclude that the nuisance count was properly dismissed under the rule in National Container Corporation v. State ex rel. Stockton, 138 Fla. 32, 189 So. 4 (1939). There the court addressed the circumstances under which a suit could be filed to enjoin a threatened, rather than existing, nuisance. The court said:
In using the language "threatened nuisance" herein we do not mean a mere threat to do a thing which may result in the creation of something which may be a nuisance, but we contemplate by this language the beginning of construction or the proceeding with plans which, if consummated, will necessarily result in the creation of a public nuisance.

189 So. at 10 (emphasis added). See Rackleff v. Texaco Trading and Transportation, Inc., 611 So.2d 95, 97 (Fla. 1st DCA 1992); St. Lucie County v. Town of St. Lucie Village, 603 So.2d 1289, 1293 (Fla. 4th DCA), review denied, 613 So.2d 12 (Fla.1992). We agree with the trial court that the nuisance count does not satisfy this test. On its face Ordinance 888 prescribes noise control standards, reserves extensive powers to North Miami to assure that the noise control standards are met, and even imposes the requirement that the amphitheater be constructed so that it can be completely enclosed if need be. North Miami has made provision for its own noise study, and for noise monitoring at the expense of the Operator. Similarly, the project cannot proceed unless the project is granted the necessary environmental permits. Bal Harbour's allegations do not rise to the level necessary under National Container to support a cause of action for nuisance.

VII.
Bal Harbour alleged that North Miami had breached the Settlement Resolution by having North Miami's noise consultant, Dr. Clifford Bragdon, execute an affidavit *365 in support of North Miami's motion for summary judgment in the Pichette litigation. We also agree with the trial court's dismissal of this claim.
According to the documents which accompany Ordinance 888, North Miami had received assurances from the Operator that the amphitheater could be constructed and operated consistent with North Miami's sound criteria. Unwilling to rely exclusively on the assurances of the Operator, North Miami hired Dr. Bragdon to serve as its noise consultant. In October 1992, Dr. Bragdon submitted a proposal for a study. The work proposal was to begin with baseline noise data collection in the areas near the amphitheater, and was to include consultation in the design and construction of the facility, as well as compliance after the facility was opened. Dr. Bragdon rendered a preliminary opinion that, subject to completion of the various steps in the work plan, it could be feasible to construct an amphitheater which would comply with North Miami's noise control requirements.
When North Miami and Bal Harbour entered into a settlement, the settlement contemplated that Bal Harbour's noise consultant, Dr. Stanley Dunn, would participate in Dr. Bragdon's work. Dr. Bragdon, as North Miami's expert, and Dr. Dunn, as Bal Harbour's expert, were to resolve any technical disagreements by discussion between the two of them. If unsuccessful, then Dr. Bragdon and Dr. Dunn were, if possible, to arrange for a binding determination by an independent scientist mutually selected by Dr. Dunn and Dr. Bragdon. Plainly the hope was that the collaboration of the experts in the study process might produce a mutually acceptable plan, or at least narrow the areas of disagreement. The settlement left open the possibility that Bal Harbour might ultimately be dissatisfied, and provided for a litigation challenge by Bal Harbour at the time that a building permit was issued by North Miami.
In the meantime, the plaintiffs in the Pichette litigation, who were residents of North Miami and Bay Harbour Islands, were not bound by the settlement between North Miami and Bal Harbour and were proceeding in court. On the Pichette plaintiffs' claim of excessive noise, North Miami submitted the affidavit of Dr. Bragdon.
We do not see how the use of Dr. Bragdon to submit an affidavit in the Pichette litigation can be viewed as a breach of the Settlement Resolution. The Pichette plaintiffs had sued North Miami over the issue of noise, and North Miami had already commissioned Dr. Bragdon to conduct a noise study. It would certainly stand to reason that North Miami would utilize the services of its own noise consultant, who was clearly the most knowledgeable person to speak about this subject. There is no provision in the Settlement Resolution which prohibits this. Further, as Bal Harbour itself acknowledged, Dr. Bragdon's affidavit was predicated on the assumption that "certain conditions, limitations, and restrictions are met...." Amended Complaint, ¶ 26. Indeed, prior to beginning work Dr. Bragdon had given a written opinion in the public record that contingent on satisfactory completion of the steps in the work plan, it was feasible to build an amphitheater which would comply with North Miami's sound criteria.
We thus agree with the trial court on dismissal of this count.

VIII.
Finally, Bal Harbour alleged that North Miami fraudulently induced it to enter into the settlement. Bal Harbour asserted that North Miami not only breached its obligations under the Settlement Resolution, but at the time that the parties negotiated the settlement, North Miami delivered assurances that it would carry out its obligations under the Resolution in good faith, when at that time North Miami had no intention to do so. This count depends entirely on the premise that North Miami has breached the Settlement Resolution. Because that claim fails, the fraudulent inducement count likewise must be dismissed.

IX.
For the reasons stated, we affirm the dismissal of the action.
Affirmed.
NOTES
[*] Chief Judge Schwartz and Judge Goderich did not hear oral argument.
[1] North Miami's Ordinance 888 and a number of supporting documents were appended to the complaints at issue here and are properly considered a part thereof for purposes of considering a motion to dismiss. See Fla.R.Civ.P. 1.130(b); Woolzy v. Government Employees Insurance Co., 360 So.2d 1153, 1154 (Fla. 3d DCA 1978).
[2] Ordinance 888 was a "development order" within the meaning of the statute. See id. § 163.3164(7), (8).
[3] Because we do not reach the merits of Bal Harbour's claims related to the North Miami Comprehensive Plan, we express no view on whether the matters set forth in Bal Harbour's "verified complaint" set forth a viable cause of action under section 163.3215, Florida Statutes.
[4] Section 163.3215 also states, "Failure to comply with this subsection shall not bar an action for a temporary restraining order to prevent immediate and irreparable harm from the actions complained of." Id. § 163.3215(4). This sentence allows the complaining party to seek an immediate temporary injunction in an emergency situation without having first to serve the "verified complaint" on the governmental unit and wait thirty days for a response. See id. This sentence does not allow a claim for injunctive relief to be brought after the expiration of the jurisdictional time periods set forth in subsection 163.3215(4).
[5] We note a possible timeliness issue based on Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469 (Fla.1993). Ordinance 888 was adopted in December of 1992. In October of 1993 the Florida Supreme Court announced Snyder. Bal Harbour argues that Ordinance 888 is properly viewed as a quasi-judicial action and is governed by Snyder. If that is so, then Snyder prescribes that review is by petition for writ of certiorari in the circuit court, id. at 476, which under Florida Rule of Appellate Procedure 9.100(c) must "be filed within 30 days of rendition of the order sought to be reviewed...." Board of Trustees of the Internal Improvement Trust Fund v. Seminole County Board of County Commissioners, 623 So.2d at 595. The parties have not addressed the question of a possible Snyder-based time bar on this count and in view of our disposition of this claim on other grounds, we need not reach that issue.
[6] An argument can be made that when section 29-12.1 is read as a whole, it contemplates that "abutting property" includes all owners of property situated within five hundred feet of the proposed planned unit development site, regardless of whether such owners' property physically touches the proposed site. That is so because the ordinance requires that notice be mailed to all owners of property within five hundred feet of the external boundaries of the proposed planned unit development site. Id. § 29-12.1(j)(2), (j)(5)b. We need not decide whether under the ordinance "abutting property" includes all properties within 500 feet of the proposed site, because under either interpretation, Bal Harbour does not abut the property.
[7] Bal Harbour also alleges that a traffic impact study was not submitted by the applicant as required by section 29-12.1(h)(12)c. We do not think that Bal Harbour has standing to complain about a North Miami traffic study.
[8] Subsection 2-11.1(b) states:

(b) Definitions. For the purposes of this section the following definitions shall be effective:
(1) The term "Commissioners" shall refer to the Mayor and the members of the Board of County Commissioners as duly constituted from time to time.
[9] This appears to be a matter of policy choice. The second paragraph invariably will involve the vote of a collegial body consisting of multiple members, where the participation of a member who should have withdrawn would not necessarily affect the outcome. Consequently the ordinance stops short of providing a voidability remedy for matters falling within the second paragraph.
[10] Additionally, the first paragraph uses the word "transaction" to describe the matter that is "voidable." Id. By contrast, the second paragraph deals with the circumstances in which an elected commissioner must withdraw from participation or voting on a matter presented to the commissioners, which ordinarily occurs in the form of resolutions or ordinances, not "transactions."
[11] The second amended complaint alleges that the federal Environmental Protection Agency has undertaken enforcement action with respect to the landfill.
[12] Bal Harbour's "verified complaint" served under Section 163.3225, Florida Statutes, alleged that the size of the amphitheater project rendered it a Development of Regional Impact, see 380.0651(3)(b)1.a., Fla.Stat., but that North Miami had not sought the required approvals.